**NICHOLAS & TOMASEVIC, LLP**
  Craig M. Nicholas (SBN 178444)
  Shaun Markley (SBN 291785)
225 Broadway, 19th Floor
San Diego, California 92101
Tel: (619) 325-0492
Fax: (619) 325-0496
Email: cnicholas@nicholaslaw.org
Email: smarkley@nicholaslaw.org

Attorneys for Plaintiff,
The Upper Deck Company

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UPPER DECK COMPANY, a Nevada corporation, <br><br> Plaintiff, <br><br> vs. <br><br> PANINI AMERICA, INC., a Delaware corporation, <br><br> Defendant. | CASE NO. **'20 CV0185 GPC KSC** <br><br> **COMPLAINT FOR:** <br><br> **1. LANHAM ACT, 15 U.S.C.A. § 1125(a);** <br> **2. LANHAM ACT, 15 U.S.C.A. § 1125(c);** <br> **3. TRADEMARK INFRINGEMENT;** <br> **4. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONSHIP;** <br> **5. INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONSHIP;** <br> **6. COMMERCIAL MISAPPROPRIA-TION;** <br> **7. RIGHT OF PUBLICITY; and** <br> **8. UNFAIR COMPETITION.** <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiff The Upper Deck Company, a Nevada corporation alleges as follows:

## INTRODUCTION

This lawsuit is about Panini America, Inc. falsely representing to consumers that it possesses the rights to sell trading cards of the greatest, most famous basketball player of all time: Michael Jordan. Panini has never had those rights, and likely never will. Panini refuses to accept that Mr. Jordan long-ago decided to affiliate himself with the premier trading card company in America: Upper Deck. Panini refuses to accept its role in selling basketball trading cards without the greatest players of the modern era. Instead, Panini hatched a scheme to trade on Michael Jordan's image without paying a dime for those rights. This lawsuit seeks to right that wrong by Panini, and recover damages caused by Panini's nefarious misconduct.

## THE PARTIES

1. Upper Deck is a corporation organized and existing under the laws of the State of Nevada. Plaintiff is authorized to conduct business in California, and has its principle place of business at 5830 El Camino Real, Carlsbad, County of San Diego, California.

2. Upper Deck is a worldwide sports and entertainment company that, for over 30 years, has been creating valuable and innovative sports memorabilia products, trading cards products, as well as many other sports and entertainment products. Upper Deck has invested huge sums developing some of the most popular, innovative, and headline-grabbing products the industry has ever seen, such as:

    a. the first ultra-premium baseball trading card set featuring full color photography, high gloss, anti-counterfeit holograms on every card, and foil wrapping;

    b. autographed insert cards; and

    c. Game jersey cards, embedding game-worn jersey swatches in trading cards.

3.      An important part of not only Upper Deck's business model, but of the trading card industry, is the ability to enter into exclusive agreements with legendary and popular athletes. Athletes choose to exclusively license various rights to Upper Deck not just to manage the volume of trading cards hitting the market, but also to protect their valuable likeness rights including their trademarks.  Athletes and other celebrities seek to avoid "any negative connotation associated with them" and the related damages resulting from tarnishment of the celebrity-athlete's potential "product endorsement, spokesperson capacities" which is one of the reasons they choose to associate with Upper Deck and its long-standing reputation as a producer of top quality, innovative products.  *Doe v. McFarlane*, 207 S.W.3d 52, 64-66 (Mo. Ct. App. 2006); *cf. Perkins Sch. for the Blind v. Maxi-Aids, Inc.,* 274 F. Supp. 2d 319, 324 (E.D.N.Y. 2003) (addressing an analogous concept in trademark dilution cases and holding "when a party sells products that are not subject to . . . quality control procedures, such sales create a likelihood of confusion as to both quality and source.").

4.      For decades, Upper Deck has had and continues to have an exclusive license with Michael Jordan ("Jordan") to use his image, name, likeness, marks, and other rights on and in connection with, among other products, trading cards.

5.      Panini America, Inc., ("Panini" or "Defendant") is, and at all relevant times was, a corporation organized and existing under and by virtue of the laws of the State of Delaware with its principle place of business in Irving, Texas.

6.      Panini is one of Upper Deck's main competitors in the trading card market. Like Upper Deck, Panini enters into exclusive license agreements for, among other licensed products, trading cards and entered into license agreements with NBA players.

7.      Upper Deck is the only trading card manufacturer that has ever had a license agreement for trading cards with Michael Jordan. Yet, Panini recently

willfully interfered with Upper Deck's agreement with Jordan in order to generate illicit profit from his image without Upper Deck's knowledge or consent.

8. Panini acted as the exclusive trading card licensee for the National Basketball Association ("NBA") since 2009 for current active players in the NBA—a license that does not include and never included the right or ability to feature Jordan in any Panini trading cards. Panini's forbearance from featuring Jordan in previous trading card releases demonstrates its longstanding understanding of the limitations of that license.

9. However, recently, Panini deliberately altered and manipulated Jordan's image into the background of multiple Panini trading cards in two trading card releases to gratuitously lend on the tremendous international brand equity and goodwill of Michael Jordan who is not only one of the greatest NBA players of all time, but a current NBA owner.

10. Panini did so to market and increase the sale of its products and brand equity, to use Jordan for commercial gain, to confuse the market, and to harm Upper Deck including Upper Deck's brands, goodwill, and exclusive contract.

11. Upper Deck invested substantial time and resources to become and remain an innovative, premium brand. Jordan only associates with a limited number of premium brands; such policy is well known in the industry, including by Panini, and for that reason, Jordan consciously licensed his rights for almost thirty years to Upper Deck.

12. Panini's use of Jordan in multiple products harms Upper Deck's and Jordan's ongoing efforts to grow and maintain their brand equity. Instead, Panini sought to extend that premium narrative to its own products by confusing consumers to think Jordan held a similar affinity and reverence for its products, without paying for or even asking for such rights. Upper Deck seeks the Court's intervention to halt this improper conduct.

## JURISDICTION AND VENUE

13. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because Upper Deck is a Nevada resident with a principle place of business in California and Panini is a Delaware resident with its principle place of business in Texas. The amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs. There is also jurisdiction pursuant to 28 U.S.C. § 1331 based on the federal Lanham Act claims at issue.

14. This Court has personal jurisdiction over Panini because it conducts substantial business in California. Panini intentionally availed itself to the laws and markets of California through operation of its business in California, including on information and belief, the sale of the products at issue in this Complaint to residents of the state of California.

15. Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(a) through (c). A substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## GENERAL FACTS

**The Value of Jordan's Brand**

16. Michael Jordan's name is distinctive, famous, and easily recognized throughout the world by hundreds-of-millions of people. *E.g. Chattanoga Mfg., Inc. v. Nike, Inc.*, 140 F. Supp. 2d 917, 920 (N.D. Ill. 2001) (Michael Jordan "is a man of extraordinary fame throughout the world."). Jordan has obtained federal registration of his name as a trademark with the U.S. Patent and Trademark Office. His name has been actively registered since at least 1988 and he has been using it in interstate commerce since 1984.

17. Jordan has been wearing the number 23, now also federally registered as a trademark, since his storied days playing college basketball for the University of North Carolina Tar Heels – where he won an NCAA Championship (by making the game-winning jump shot no less) and was twice selected by consensus to the NCAA

All-American First Team. He also won the coveted Naismith and Wooden College Player of the Year awards all while wearing number 23, with his name ("Jordan"), every week in front of tens-of-thousands of fans in live attendance at the games, and as further broadcast to millions over television.

18. Following his stellar collegiate career, the Chicago Bulls drafted Jordan third overall in the 1984 NBA draft. In Chicago, he continued to don his name ("Jordan") and the number 23 in the distinctive colors of the Bulls' red. The Bulls retired Jordan's number "23" in November of 1994 in a ceremony that included the erection of a sculpture of him outside of the United Center, home of the Chicago Bulls.

19. While playing in the NBA, Jordan won six championships with the Chicago Bulls, and "[d]uring his professional basketball career, Jordan's uniform prominently displayed the name 'JORDAN' and, except for a brief use of the number '45,' the number '23.'" *Chattanoga Mfg.*, 140 F. Supp. 2d at 921.

20. The Jordan name and image, especially when paired with the number 23, is and continues to be legendary, if not the most famous name and jersey number combination in the history of professional sports. His presence in the NBA transcended his career given that he is a current NBA team owner.

21. Jordan's image, with the visible number 23, is even more distinctive, recognizable, and valuable, especially when combined with the red colors Jordan donned on his playing jerseys when in the NBA (i.e., when playing with the Chicago Bulls- whose colors are black and red) and the name of his former team, the Chicago Bulls. Millions around the globe easily recognize these marks, either alone or in combination with one another.

22. Trading cards featuring Jordan's publicity rights are highly valuable and his trading cards are among the most sought after in the marketplace. This is true both for existing cards sold on the secondary market and the sale of new cards within a trading card release given the scarcity for new Jordan trading cards on the market,

and the scarcity of authentic Jordan trading cards on the secondary market. The ability to obtain a Jordan trading card within a trading card release is a primary driver for the entire trading card set and allows Upper Deck to obtain substantially increased profits for the other cards within the release.

**Jordan's Contract with Upper Deck**

23.   At all relevant times, Upper Deck maintained an exclusive license agreement with Jordan providing, among other rights, the exclusive license to use Jordan's name, image, likeness, certain marks, and other personality/publicity rights on trading cards.

24.   For example, Upper Deck recently participated in a premium with Hanes to celebrate Jordan's 30-year anniversary with Hanes by inserting trading cards featuring Jordan from his various Hanes commercials aired in the early 1990s. Such cards ignited a frenzy among collectors, buying underwear and t-shirts in massive quantities for the opportunity to receive a Jordan trading card.

25.   A new trading card featuring Jordan in his Chicago Bulls jersey has not been released for at least 10 years because Panini has had no right to do so.  As a result, collectors have an insatiable appetite for any Jordan trading card, especially a trading card featuring Jordan in his Bulls uniform.

26.   In addition to the demand for new, Jordan trading cards, Jordan trading card sales comprise roughly *42% of the total NBA trading card sales* on eBay per *Forbes* magazine in March 2019.  In February 2019, a rare 1997-98 Precious Metal Gems trading card featuring Jordan card sold on eBay for $350,100.  According to *Forbes* magazine, it is the third most expensive basketball card ever sold and caused a frenzy of eBay bids placed by elite buyers hoping to purchase the card.

27.   As part of the exclusive license, Jordan assigned Upper Deck the right to commence an action relating to a third party's infringing use of Jordan's rights granted under the agreement.

28.    Athletes and other famous figures, like Jordan, choose to enter exclusive licensing agreements to control and manage their fame and goodwill. These arrangements allow the famous figures to protect and control the quantity as well as quality of merchandise featuring their personality and other rights.

29.    Jordan chooses to contract exclusively with Upper Deck for these very reasons. Use of his name and likeness on competing goods harms not only the value of the contract, but also harms Jordan's brand, reputation, and goodwill. This, in turn, has a longstanding negative impact on the value of Jordan's ability to license his publicity rights in the future and the value of these deals.

30.    This exclusive agreement is meant to and should result in an economic benefit to Upper Deck – namely in the form of its exclusive right to produce trading cards bearing Jordan's name and likeness. Upper Deck pays large sums for the exclusive right to utilize Jordan's publicity rights on trading cards. Those exclusive rights are an important component of and incentive for Upper Deck to invest resources in creating the popular and innovative (and costly) products that have resonated, time and again, with consumers.

31.    Upper Deck frequently intends to and does extend these agreements into successive, multi-year terms. This is part of the contract value to Upper Deck—the potential for long-term, repeat business with Jordan.  As such, Upper Deck is currently in an economic relationship with Jordan and this relationship has the probability of future economic benefit.

**Panini's Infringing Use of Jordan's Rights**

32.    Panini has *never* had any license agreement with Jordan to use his publicity rights on trading cards or any other products. As one of the three largest trading card manufacturers since approximately 2009, Panini is very familiar with Upper Deck's and Jordan's exclusive contract.  Panini has acted as the exclusive trading card licensee for the NBA since 2009 for current, active NBA players,

however, such rights do not in any way include the right to produce Michael Jordan trading cards.

33. Despite this and its ten-plus years of NBA industry knowledge and awareness of Upper Deck's longstanding, exclusive Jordan contract, Panini deliberately manipulated Jordan's

publicity rights on and in connection with the sale of *two different trading cards* in two different trading card products, demonstrating an ongoing willful disregard for Jordan, Upper Deck, and their longstanding contract, goodwill, and brand.

34. Panini's intentional, repeated, and unauthorized and unlawful use of Jordan's publicity rights is irrefutably demonstrated by the nuances in its products.

35. First, in November 2017, Panini printed the 2017-2018 "Donruss Basketball Retro Series" card shown below ("Retro 2017 Card") featuring Scottie Pippen and intentionally excluding any feature of Jordan, given that Panini does not have a license to feature Jordan's publicity rights on trading cards. In order to exclude Jordan, Panini intentionally cropped the image to remove Jordan from the initial version of the card.

36. A few months later in April 2018, Panini released the 2017-18 Donruss Optic Retro set—Panini's more expensive and higher end version of the prior Donruss Basketball Retro series released in November 2017. Within this Optic trading card release is the 2017-2018 Donruss Optic NBA Retro trading card with the exact same Scottie Pippen image featured on the Retro 2017 Card; however, this card cleverly and purposely features Jordan in the bottom right corner ("Retro 2018 Card"), significantly enhancing the value of this higher end release and Panini's brand.

37. The Retro 2017 Card and Retro 2018 Card are identified below on the left and right, respectively; in addition to featuring Jordan, the Retro 2018 Card can be distinguished by the adjustment of the brand logos located at the bottom right-hand corner of each card.

**Retro 2017 Card**          **Retro 2018 Card**

 

38.   Panini didn't stop there with its illegal conduct. Panini committed another similar deceptive offense when it released its 2018-19 Panini Contenders Basketball trading card set. Within this set, Panini included a Dennis Rodman card ("Contenders Card"). But the background of this Contenders Card caught more consumer interest and excitement than the subject because the background prominently and intentionally featured Jordan.

**Contenders Card**



39.    Panini deliberately altered the Contenders Card to enhance the appearance of Jordan to increase the value of the Contenders trading card release, stimulate collector interest, and make a profit, lending on and to the detriment of Upper Deck's rights and goodwill. The fact that Panini, having never made a single Jordan card, recently releases two different cards in two different trading card products, clearly featuring Jordan in the background, underscores a clear, deliberate, and ongoing intent to nefariously and willfully use Upper Deck's Jordan rights in an unauthorized and illegal manner to enhance Panini brand and garner illicit profits.

40.    Based on the above examples, there can be no doubt that Panini uses Jordan's distinctive and valuable marks in its product, i.e., Jordan's picture, his famous jersey number "23," his most recognizable team name Bulls, and the distinctive color patterns red or red/white associated with Jordan.

41.    Panini intentionally and egregiously uses these elements to associate its company and products with Jordan, and to lend on the tremendous brand and goodwill associated with Jordan and his famous marks. Panini's unlawful acts make

its products exponentially more desirable and valuable than they would be without Jordan.

42.    Panini's misconduct and misuse of rights caused an industry-wide frenzy. Beckett Media, a prominent sports memorabilia publisher and the primary resource valuing trading cards and collectibles, published an article commenting on Jordan's appearance on Panini's new product line. Beckett Media reported on the rarity of Jordan's appearance in an NBA trading card release given his exclusive license with Upper Deck, and the enormous consumer appetite for all things Jordan in a Bulls uniform, especially a trading card.  In addition to media coverage, sales on the secondary market, such as eBay, list and identify these Panini cards as "Jordan cards" - cementing the average consumer's perception that these are licensed Jordan products when they are not, and attempting to lend on Jordan's name on the cards to yield a higher sale price.

43.    Panini sells these infringing cards in interstate commerce in an attempt to make a profit.  Panini does so without the permission of Upper Deck or Jordan.

**Value of Background Imagery Historically in Trading Cards**

44.    The background imagery of a trading card has always been an important factor in the trading card market. In fact, there is a longstanding history in the industry of attributing greater value and intrigue to cards where the background provides even more interest than the subject matter referenced on the face of the card.  Use of cameos featuring ancillary figures in the background of cards increases the value of those cards, as demonstrated below.

45.    Individuals in the background of an image on a trading card can dramatically increase the value of both the trading card and the trading card release. In 2007, a Topps Derek Jeter baseball trading card that featured George W. Bush and Mickey Mantle in the background was placed in its 2007 Topps 1 trading card release in order to increase the value of the card and the release.  Once the secondary market

discovered the card with George W. Bush and Mickey Mantle in the background, the price of the trading card packs and the individual card skyrocketed.

46.    Another example of Jordan's appearance in the background of an otherwise common trading card includes the 1990-91 Hoops NBA Sam Vincent trading card, whereby Jordan is prominently featured on the card, thereby increasing its market value by 4000%.

47.    Also, Jordan's appearance dramatically enhanced, and increased the value of the 1997-98 Metal Universe Titanium trading card featuring Anfernee Hardaway, and is often listed on eBay as an Anfernee Hardaway card "With Michael Jordan."

48.    Similarly, the 1994-95 Pinnacle Hockey trading card increased in value in excess of 1000% after collectors discovered NHL All-Star Patrick Kane's cameo as a 6 year-old in the background of the card.

49.    Panini's feature of Jordan is deliberate and extends far beyond fair use. Panini intended to benefit from and succeeded in utilizing Jordan's publicity rights in an unauthorized manner and for Panini's economic benefit.

50.    Jordan never consented to Panini's use of his marks or publicity rights, but instead licensed to Upper Deck such *exclusive* rights to use these elements for decades, and assigned to Upper Deck the right to enforce infringing use of Jordan's rights on trading cards.

51.    The infringing use of Jordan's marks and publicity rights on Panini products greatly increases Panini's and its products' goodwill and value, including the value on the secondary market. Beckett Media noted the increased value of the Panini products due to the presence of Jordan.

52.    When the Contenders Cards, referenced in Paragraph 38 above, first released as *just* a Dennis Rodman card, most were selling on eBay for a nominal amount.  However, where eBay sellers list those Panini products for sale with the name "Michael Jordan" in the listing title, the same products are far more expensive,

in excess of 10 times the value. Historically, the discovery of Jordan's marks and publicity rights on trading cards after the product's release causes the value of those cards advertised for sale on the secondary market to increase far over the original value.

53. Upper Deck's longstanding agreement with Jordan is widely known, including by Upper Deck competitors like Panini, who intended to and did in fact disrupt the contract by making products bearing Jordan's appearance, likeness, and marks of Jordan. Panini has prevented Upper Deck from enjoying the exclusive rights it paid to receive.

54. Panini's manufacture and sale of trading cards bearing Jordan's publicity rights diminishes the value of Upper Deck's agreement by diverting to Panini the sales proceeds and the exclusivity for which Upper Deck pays Jordan. In addition to the direct syphoning of expected sales, Panini's introduction of additional cards bearing Jordan's likeness into the market reduces the value of Upper Deck cards and dilutes the market. Moreover, Panini's production of cards featuring Jordan also reduces the value of Upper Deck's cards by diminishing the goodwill and publicity value surrounding Jordan and causes consumers' confusion.

55. The dilution of Jordan's value is not just limited to the quantity of cards on the market, but also the superior brand equity associated with Upper Deck. Michael Jordan is a premium brand and also associates with premium, high quality companies such as Upper Deck. Panini does not enjoy the same brand equity or reputation as Upper Deck. Panini does not have the rights to produce trading cards of several of the greatest NBA players of the modern era. Panini knows its improper conduct diminishes the value of Upper Deck's contract and interferes with its current and future relationship with Jordan.

56. Panini continues to blatantly engage in conduct that constitutes trademark infringement, false advertising, dilution, violations of the right of

publicity, misappropriation, tortious interference, and unfair competition as more fully set forth below.

## FIRST CAUSE OF ACTION
### BY UPPER DECK AGAINST PANINI FOR TRADEMARK INFRINGEMENT, FALSE AFFILIATION, FALSE ADVERTISING, AND UNFAIR COMPETITION
### (Lanham Act, 15 U.S.C.A. § 1125(a))

57.     Upper Deck repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

58.     Upper Deck has the exclusive rights to use certain of Jordan's marks which are famous and distinctive within the meaning of Section 43 of the Lanham Act, 15 U.S.C. § 1125. These include "Michael Jordan" and "23."

59.     All of the marks have been in use for many years and play a prominent role with respect to Jordan's and Upper Deck's marketing, advertising, and the popularity of their products, services, and commercial activities across many different media.   Jordan's marks have gained widespread publicity and public recognition throughout the United States, including in California.

60.     Jordan's marks were famous long before Panini began using unauthorized reproductions on their unauthorized products.

61.     Panini has infringed these rights by using the above-described marks of Jordan, on and in connection with Panini's unauthorized products in interstate commerce.  Panini has done so without the permission of Jordan or Upper Deck.

62.     Panini's acts constitute trademark infringement, false designation of origin, false or misleading representation, and false or misleading description which (A) is likely to cause confusion, to cause mistake, and to deceive as to the affiliation, connection, right to use, or association of Panini with Jordan and as to the origin, sponsorship, or approval of Panini's products, services, and commercial activities by Jordan; and (B) in commercial advertising or promotion, misrepresent the nature,

characteristics, qualities or origin of Panini's products, services, or commercial activities and/or Jordan's authorized products, services, or commercial activities.

63.   Panini's actions constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. Section 1125(a).  As a result of Panini's unlawful acts, Panini has been unjustly enriched and Upper Deck has been damaged, as has Jordan.

64.   Panini's unlawful activities have caused, and unless enjoined by this Court, will continue to cause, irreparable injury and other damage to Jordan and to Upper Deck in terms of their business, reputation, and good will in the marks and related rights to use those marks.  Upper Deck is damaged and believes it will continue to be damaged by Panini's false descriptions and representations through direct diversion of sales and/or through a lessening of goodwill associated with Upper Deck's products and Jordan's marks.  Upper Deck pays large premiums for the exclusive right to use Jordan's rights, including his marks described above, on trading card products. Upper Deck intends to foster and promote the goodwill associated with Jordan and his marks, and to have a continuing and ongoing relationship with Jordan to create a mutual benefit to both parties. Panini's alleged acts also negatively impact customers' perceived value of the cards by increasing the volume of cards available on the market and associating Jordan with Panini's inferior brand equity.  Neither Jordan nor Upper Deck have any adequate remedy at law.

65.   Upper Deck seeks injunctive relief, compensatory damages, disgorgement of profits, punitive damages, and recovery of its costs and attorney's fees against Panini for its various and continuing acts of infringement, false affiliation, false advertising, and false competition.

## SECOND CAUSE OF ACTION
**BY UPPER DECK AGAINST PANINI FOR TRADEMARK DILUTION**
**(Lanham Act, 15 U.S.C.A. § 1125(c))**

66. Upper Deck repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

67. Panini used the trademarks of Jordan, on and in connection with Panini's unauthorized products in interstate commerce and without Jordan's or Upper Deck's permission.

68. Panini's acts dilute and/or are likely to dilute the distinctive quality of those marks described above, and to lessen the capacity of such marks to identify and distinguish Upper Deck and Jordan's trading cards.

69. Panini's unlawful use of Jordan's marks in connection with inferior goods is also likely to tarnish those marks and cause blurring in the minds of consumers between Upper Deck, Jordan, and Panini, thereby lessening the value of the marks as well as the value of Upper Deck and Jordan's products.

70. Panini's unlawful activities have caused, and unless enjoined by this Court, will continue to cause, irreparable injury and other damage to Jordan and to Upper Deck. Neither Jordan nor Upper Deck has any adequate remedy at law.

71. Upper Deck seeks injunctive relief, compensatory damages, disgorgement of profits, and punitive damages against Panini for its various and continuing acts of dilution.

## THIRD CAUSE OF ACTION
**BY UPPER DECK AGAINST PANINI FOR REGISTERED**
**TRADEMARK INFRINGEMENT AND COUNTERFEITING**
**(15 U.S.C.A. § 1114)**

72. Upper Deck repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

73. Panini has used in commerce reproductions, counterfeits, copies, and/or colorable imitations of Jordan' registered marks in connection with the sale, offering

for sale, distribution, or advertising of its trading card products. Panini's use of these registered marks is causing or is likely to cause confusion, or to cause mistake, or to deceive consumers and the public into believing that the Panini products are the products of Jordan or of Upper Deck.

74. Panini has also reproduced, counterfeited, copied, and/or colorably imitated Jordan registered marks and applied such reproductions, counterfeits, copies, and/or colorable imitations to trading cards, signs, prints, and/or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, and advertising of its goods.

75. Panini used the registered marks without the permission of Jordan or Upper Deck.

76. Panini's acts as alleged are causing, and unless enjoined by this Court, will continue to cause a likelihood of confusion and deception of members of the trade and public, and, additionally, injury to Upper Deck's and Jordan's goodwill and reputation, for which neither Upper Deck nor Jordan has any adequate remedy at law.

77. Panini's acts demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with the Jordan marks to Jordan's and Upper Deck's great and irreparable harm.

78. Upper Deck seeks injunctive relief, compensatory damages, disgorgement of profits, punitive damages, destruction of the infringing articles under 15 U.S.C.A. Section 1118, and recovery of its costs and attorneys' fees against Panini for its various and continuing acts of infringement and counterfeiting.

**FOURTH CAUSE OF ACTION**
**BY UPPER DECK AGAINST PANINI FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS UNDER CALIFORNIA LAW**

79. Upper Deck repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

80. Upper Deck was, and continues to be, in an economic relationship with Jordan relating to the use of his image, name, likeness, and other rights on trading cards. These relationships are meant to and should result in an economic benefit to Upper Deck – namely in the form of its exclusive right to produce trading cards bearing the image, name, likeness, marks and other indicia and publicity rights that the public associates with Jordan.

81. Upper Deck frequently intends to and does extend these agreements into successive, multi-year terms. As such, Upper Deck is currently in an economic relationship with Jordan and this relationship has the probability of future economic benefit beyond the current contract term.

82. Panini knew of Upper Deck's relationship and history with Jordan and intended to disrupt this relationship by making trading cards bearing Jordan's publicity rights. Such relationship is common knowledge in the sports trading card and memorabilia industry.

83. Panini has no valid right to create trading cards bearing elements infringing on Upper Deck's Jordan rights. Panini knows its improper conduct diminishes the value of Upper Deck's contract and interferes with future relationship with Jordan.

84. Through its actions, Panini disrupted and diluted this relationship and harmed Upper Deck who paid and continues to pay large sums for these exclusive rights while not receiving the full advantage of exclusivity that it bargained for. Panini's manufacture and sale of trading cards bearing Jordan's image, name, likeness, marks and other indicia diminishes the value of Upper Deck's agreement by diverting to Panini the sales proceeds and the exclusivity for which Upper Deck pays Jordan.

85. Introducing additional cards bearing Jordan's likeness into the market reduces the value of Upper Deck's trading cards by diluting the market, i.e. increasing the overall number of Jordan's cards in circulation. Panini also reduces the value of

Upper Deck's cards by diminishing the goodwill and publicity value surrounding Jordan and causes consumers confusion.   It is for this very reason that these agreements are exclusive—to preserve, protect, and enhance the brand of the athlete and the associated value of the trading cards to the athlete and Upper Deck.

86.   Panini's misconduct is willful, wanton and reckless, justifying an award of punitive damages.

## FIFTH CAUSE OF ACTION
## BY UPPER DECK AGAINST PANINI FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS UNDER CALIFORNIA LAW

87.   Upper Deck repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

88.   Upper Deck has an exclusive license with Jordan that is meant to and should result in an economic benefit to Upper Deck – namely in the form of its exclusive right to produce trading cards bearing Jordan's image, name, likeness, marks and other indicia or personality/publicity rights that the public associates with Jordan.

89.   Panini knew of Upper Deck's contract with Jordan and intended to disrupt the contract by carefully crafting and manipulating trading cards bearing the image, name, likeness, marks and other indicia or personality/publicity rights that the public associates with Jordan.  Based on common knowledge within the industry, Panini knew of this contractual relationship, and had not released Jordan trading cards in the past.

90.   Panini's misconduct in making competing and infringing trading cards harms and prevents the performance of the exclusive contract. Through its actions, Panini disrupted this relationship and harmed Upper Deck who paid and continues to pay large sums for these exclusive rights while not receiving the full advantage of exclusivity that it bargained for.

91. The dilution of Jordan's value is not just limited to quantity of cards on the market, but also quality. Athletes, including Jordan, choose to exclusively license their various rights to Upper Deck not just to control volume of cards hitting the market, but also because of Upper Deck's longstanding reputation as a producer of top quality, innovative trading cards. Courts are equally sensitive to the vital importance of celebrities mitigating any public negative connotation or association, and the related damages resulting from tarnishment of the celebrity-athlete's potential product endorsement and spokesperson capacities through negative or over association with certain brands.

92. Panini's unlawful actions despite its knowledge that Upper Deck possesses exclusive rights to Jordan's image, are willful, wanton and reckless, such that an award of punitive damages is appropriate.

## SIXTH CAUSE OF ACTION
## BY UPPER DECK AGAINST PANINI FOR CALIFORNIA COMMON LAW COMMERCIAL MISAPPROPRIATION

93. Upper Deck repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

94. Jordan granted and assigned Upper Deck the right to pursue claims relating to the use of his personality/publicity rights on trading cards.

95. Panini uses the name, image, and likeness of Jordan on and in connection with the sale of Panini trading cards, resulting in commercial benefit to Panini. Neither Upper Deck nor Jordan consented to this use by Panini.

96. Panini knows that it had no right to use these publicity rights on trading cards. Panini did not obtain any consent from Upper Deck to use Jordan's publicity rights on trading cards. Additionally, Upper Deck publicly announced the existence of its exclusive contract with Jordan on several instances and it has been public knowledge for decades that Jordan has an exclusive trading card contract with Upper Deck.

97.    Panini's use damages Upper Deck by diverting sales of trading cards bearing Jordan's publicity rights, diluting the market and demand for such cards, and diminishing Jordan's ability to control the value of his own brand by controlling which companies to contract with and how many cards to produce. This harms Jordan's and Upper Deck's goodwill and future ability to generate earnings from use of his name and likeness.

## SEVENTH CAUSE OF ACTION
### BY UPPER DECK AGAINST PANINI FOR VIOLATION OF CALIFORNIA'S STATUTORY RIGHT OF PUBLICITY

98.    Upper Deck repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

99.    Jordan granted and assigned to Upper Deck the right to pursue claims related to the use of his publicity rights on trading cards, including his image, name, likeness, marks and other indicia. This includes a right to bring a claim pursuant to California Civil Code section 3344 *et seq.*

100.    As evidenced in part by the Panini products referenced herein, Panini uses Jordan's image, photographs, and/or likeness on and in direct connection with the sale of Panini trading cards, resulting in a commercial benefit to Panini. Neither Upper Deck nor Jordan consented to this use by Panini.

101.    Panini had a longstanding knowledge that it does not and never had the right to use these rights to design, manufacture, distribute, and sell Jordan trading cards. As a major trading card manufacturer, with an NBA license for over 10 years, which does not include rights to feature Jordan in any way, Panini is undoubtedly familiar with Upper Deck's and Jordan's exclusive contract, given that prior to the infringing cards at issue herein, Panini never released a Jordan trading card, let alone an Jordan trading card featuring NBA indicia.

102.    Panini's use damages Jordan and Upper Deck by diverting sales of trading cards bearing his publicity rights, diluting the market and demand for such

cards, and diminishing his ability to control the value of his own brand by controlling which companies to contract with and how many cards to produce. This harms Jordan's goodwill and future ability to generate earnings from use of his name and likeness.

### EIGHTH CAUSE OF ACTION
### BY UPPER DECK AGAINST PANINI FOR VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW

103. Upper Deck repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

104. California Business & Professions Code sections 17200, *et seq.* ("UCL"), prohibits unfair competition in the form of any unlawful, unfair, deceptive, or fraudulent business practice. Panini's conduct described herein violates the UCL including, but not limited to the following:

    a. Violating section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a), prohibiting the use of false designations of origin, false descriptions, and false representations in the advertising and sale of goods and services;

    b. Interfering with Upper Deck and Jordan' prospective and actual economic and contractual relationships; and

    c. Violating Jordan' common law and statutory rights of publicity.

105. The unlawful business practices described above have proximately caused monetary damages to Upper Deck whose rights are violated by Panini's conduct. Upper Deck has lost money as a result of Panini's acts of unfair competition. Upper Deck is also entitled to injunctive relief putting an end to this illegal activity.

106. Pursuant to the UCL, Upper Deck is entitled to restitution acquired by Panini by means of such unlawful business practices, in amounts not yet known, but to be ascertained at trial.

107. Private enforcement of these rights is necessary as no public agency has pursued enforcement. There is a financial burden incurred in pursuing this action,

and it would be against the interests of justice to require the payment of attorneys' fees from any recovery in this action. Upper Deck is therefore entitled to an award of attorney's fees and costs of suit pursuant to California Code of Civil Procedure Section 1021.5.

## **PRAYER FOR RELIEF**

WHEREFORE, Upper Deck prays for judgment as follows:

1.    For compensatory and consequential damages according to proof;

2.    For restitution, statutory damages and penalties according to proof;

3.    For an injunction to prohibit Panini to engage in the practices complained of herein;

4.    For pre-judgment interest;

5.    For enhanced or punitive damages where permitted given Panini's reprehensible and malicious misconduct;

6.    For disgorgement of profits where permitted;

7.    For destruction of infringing or counterfeit goods where permitted;

8.    For reasonable attorneys' fees, expenses and costs where permitted; and

9.    For such other relief that the court may deem just and proper.

## **REQUEST FOR JURY TRIAL**

Upper Deck hereby requests a trial by jury.


DATED:   January 29, 2020                    **NICHOLAS & TOMASEVIC, LLP**


                                         By:    */s/ Craig Nicholas*
                                                Craig M. Nicholas
                                                Shaun A. Markley
                                                225 Broadway, 19th Floor
                                                San Diego, California 92101
                                                Tel:  (619) 325-0492
                                                Fax: (619) 325-0496
                                                Email: cnicholas@nicholaslaw.org
                                                Email: smarkley@nicholaslaw.org

                                                *Attorneys for Plaintiff*