**NICHOLAS & TOMASEVIC, LLP**
Craig M. Nicholas (SBN 178444)
Shaun Markley (SBN 291785)
225 Broadway, 19th Floor
San Diego, California 92101
Tel: (619) 325-0492
Fax: (619) 325-0496
Email: cnicholas@nicholaslaw.org
Email: smarkley@nicholaslaw.org

Attorneys for Plaintiff
The Upper Deck Company

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UPPER DECK COMPANY, a Nevada corporation,<br><br>Plaintiff,<br><br>vs.<br><br>PANINI AMERICA, INC., a Delaware corporation,<br><br>Defendant. | Case No. 3:20-cv-00185-GPC-KSC<br><br>**PLAINTIFF THE UPPER DECK COMPANY'S OPPOSITION TO DEFENDANT PANINI AMERICA, INC.'S MOTION TO DISMISS**<br><br>**Hearing Date**: June 12, 2020<br>**Time**: 1:30 p.m.<br>**Courtroom**: 2D<br><br>**Judge**: Hon. Gonzalo P. Curiel<br>**Magistrate Judge**: Hon. Karen S. Crawford<br><br>**Complaint Filed**: January 29, 2020<br>**Trial Date**: None Set |

# TABLE OF CONTENTS

I.  INTRODUCTION AND RELEVANT FACTS ...........................................1

II.  LEGAL STANDARD ........................................................................2

III.  ARGUMENT ....................................................................................3

    A.  **Upper Deck Adequately States a Claim for Its First Cause of Action under Section 1125(a)** ..........................3

        1.  *Upper Deck Adequately States a Claim under Section 1125(a)(1)(A)* ...........................................3

            a.  **Courts Consistently Recognize a Celebrity's Image May Serve as a Protectable Trademark Under 1125(a)(1)(A)** ..................................3

            b.  **Panini's Use of Jordan's Persona On Its Trading Cards Causes Consumers To Believe Jordan Endorses The Products** ..................4

        2.  *Upper Deck Adequately States a Claim under Section 1125(a)(1)(B)* ...........................................10

            a.  **Panini's Representations Regarding Its Affiliation with Jordan Are False and Misleading** ....................................................10

            b.  **Tendency to Deceive Is Presumed and Alleged** ........................................................13

            c.  **Panini's Decision to Place Jordan in Its Cards Is Material** ..........................................14

    C.  **Registered Trademark Infringement and Dilution** ......15

    D.  **Upper Deck Adequately Alleges Business Tort Theories** ...................................................................16

        1.  *Panini's Conduct Disrupted Upper Deck's Exclusive Licensing Agreement to Upper Deck's Detriment* ....................................................17

        2.  *Panini Intended this Disruption* ...............................20

        3.  *Panini's Acts Were Wrongful* ...................................21

    E.  **Right of Publicity Claims Easily Survive Panini's Shallow Attacks** ............................................21

        1.  *Jordan Can and Did Assign Right of Publicity Claims* .................................................................21

           *2.*     *Jordan Is Identifiable in the Pippen Card* ..............................21

           *3.*     *Panini's Use Is Not Incidental* .................................................23

           *4.*     *Jordan Is Not Merely a Member of a Defineable Group* ........................................................................................24

**IV.**    **CONCLUSION** .........................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**CASES**

3

*Abdul-Jabbar v. Gen. Motors Corp.,*
4  85 F.3d 407 (9th Cir. 1996) ................................................................4

*AlterG, Inc. v. Boost Treadmills LLC,*
5  388 F. Supp. 3d 1133 (N.D. Cal. 2019)............................................19

6

*AMF v. Sleekcraft Boats,*
7  599 F.2d 341 (9th Cir. 1979) ..............................................................4

*Appliance Recycling Centers of Am., Inc. v. JACO Envtl., Inc.,*
8  378 F. App'x 652 (9th Cir. 2010).....................................................14

9

*Balsley v. LFP, Inc.,*
10  No. 1:08 CV 491, 2010 WL 11561844 (N.D. Ohio Jan. 26, 2010) ..................9

*Bd. of Trade of San Francisco v. Swiss Credit Bank,*
11  728 F.2d 1241 (9th Cir. 1984) ...........................................................16

12

*Behr Process Corp. v. RPM Int'l Inc.,*
  2014 WL 12584385 (C.D. Cal. May 20, 2014)................................18
13

*Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.,*
14  339 F. Supp. 2d 944 (W.D. Mich. 2004) ..........................................15

15

*Brackett v. Hilton Hotels Corp.,*
  619 F. Supp. 2d 810 (N.D. Cal. 2008)..............................................18
16

*Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.,*
17  No. 10 CV 2333 KMW, 2013 WL 822173 (S.D.N.Y. Mar. 6, 2013)...............9

18

*Cairns v. Franklin Mint Co.,*
  107 F. Supp. 2d 1212 (C.D. Cal. 2000) ..............................................9
19

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,*
20  20 Cal. 4th 163 (1999)......................................................................25

21

*Clorox Co. v. Reckitt Benckiser Grp. PLC,*
  398 F. Supp. 3d 623 (N.D. Cal. 2019)..............................................14
22

*Comedy III Prods., Inc. v. Gary Saderup, Inc.,*
23  25 Cal. 4th 387 (2001)......................................................................23

24

*Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.,*
  911 F.2d 242 (9th Cir. 1990) .......................................11, 12, 14, 15
25

*Davis v. Elec. Arts Inc.,*
26  775 F.3d 1172 (9th Cir. 2015) ..........................................................24

27

*Doe v. McFarlane,*
  207 S.W.3d 52 (Mo. Ct. App. 2006) ................................................18
28

*Downing v. Abercrombie & Fitch*,
  265 F.3d 994 (9th Cir. 2001) ................................................................4, 5

*Eastwood v. Nat'l Enquirer, Inc.*,
  123 F.3d 1249 (9th Cir. 1997) ..................................................................18

*Estate of Smith v. Cash Money Records, Inc.*,
  No. 14CV2703, 2018 WL 2224993 (S.D.N.Y. May 15, 2018) ........................9

*ETW Corp. v. Jireh Pub., Inc.*,
  332 F.3d 915 (6th Cir. 2003) ....................................................................9

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
  778 F.3d 1059 (9th Cir. 2015) ..........................................................4, 5, 6

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
  925 F.Supp.2d 1067 (C.D. Cal. 2012) ........................................................9

*G.H. Mumm Champagne v. Eastern Wine Corp.*,
  142 F.2d 499 (2nd Cir.1944) ..................................................................16

*Gibson v. BTS N., Inc.*,
  No. 16-24548-CIV, 2018 WL 888872 (S.D. Fla. Feb. 14, 2018) ................13

*Grant v. Esquire, Inc.*,
  367 F. Supp. 876 (S.D.N.Y. 1973) ..........................................................18

*Halcyon Horizons, Inc. v. Delphi Behavioral Health Grp., LLC*,
  No. 17-CV-00756-JST, 2017 WL 1956997
  (N.D. Cal. May 11, 2017) ......................................................................16

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
  724 F.3d 1268 (9th Cir. 2013) ....................................................12, 21, 23

*Instant Checkmate, Inc. v. Background Alert, Inc.*,
  No. 3:14-CV-01182-MMA-DHB, 2014 WL 12526275 (S.D. Cal.
  Dec. 5, 2014) ......................................................................................11

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
  299 F.3d 1242 (11th Cir.2002) ..............................................................14

*Johnson v. Harcourt, Brace, Jovanovich, Inc.*,
  43 Cal. App. 3d 880 (Cal. Ct. App. 1974) ..............................................24

*Jordan v. Jewel Food Stores, Inc.*,
  743 F.3d 509 (7th Cir. 2014) ............................................................11, 18

*Korea Supply Co. v. Lockheed Martin Corp.*,
  63 P.3d 937 (Cal. 2003) ....................................................................17, 20

*Leaf Trading Cards, LLC v. Upper Deck Co.*,
  No. 3:17-CV-3200-N-BT, 2020 WL 819392
  (N.D. Tex. Feb. 19, 2020) ......................................................................19

*LifeScan, Inc. v. Am. Health Care, Inc.,*
No. C 05-2016 JSW (MEJ), 2007 WL 9753667
(N.D. Cal. June 5, 2007) ........................................................................18

*Lopez v. Smith,*
203 F.3d 1122 (9th Cir. 2000) ..................................................................3

*Make Him Smile, Inc. v. Trek Bicycle Corp.,*
No. 2:17-CV-07136-RGK-KS, 2018 WL 5986983
(C.D. Cal. Jan. 18, 2018) .....................................................................5, 9

*Merck Eprova AG v. Gnosis S.p.A.,*
760 F.3d 247 (2d Cir. 2014) ..................................................................14

*New Kids on the Block v. News Am. Publ'g., Inc.,*
971 F.2d 302 (9th Cir. 1992) ..................................................................10

*Newcal Indus., Inc. v. Ikon Office Solution,*
513 F.3d 1038 (9th Cir. 2008) ................................................................11

*Newcombe v. Adolf Coors Co.,*
157 F.3d 686 (9th Cir. 1998) ..................................................................22

*Nova Wines, Inc. v. Adler Fels Winery LLC,*
467 F. Supp. 2d 965 (N.D. Cal. 2006) ......................................................9

*Nutrition Distribution LLC v. PEP Research, LLC,*
No. 16CV2328-WQH-BLM, 2019 WL 652391
(S.D. Cal. Feb. 15, 2019) ......................................................................10

*Pacific Gas & Electric Co. v. Bear Stearns & Co.,*
50 Cal.3d 1118 (1990) ...........................................................................17

*Perkins Sch. for the Blind v. Maxi-Aids, Inc.,*
274 F. Supp. 2d 319 (E.D.N.Y. 2003) ....................................................18

*Perkins v. Linkedin Corp.,*
53 F. Supp. 3d 1222 (N.D. Cal. 2014) ....................................................24

*PhotoMedex, Inc. v. Irwin,*
601 F.3d 919 (9th Cir. 2010) ..................................................................13

*Pirone v. MacMillan, Inc.,*
894 F.2d 579 (2d Cir. 1990) .................................................................8, 9

*POM Wonderful LLC v. Purely Juice, Inc.,*
No. CV-07-02633CAS(JWJX), 2008 WL 4222045
(C.D. Cal. July 17, 2008) .......................................................................14

*Proctor & Gamble Co. v. Haugen,*
222 F.3d 1262 (10th Cir. 2000) .........................................................11, 12

*Quelimane Co. v. Stewart Title Guar. Co.,*
960 P.2d 513 (Cal. 1998) .......................................................................17

*San Diego Cty. Credit Union v. Citizens Equity First Credit Union*,
    360 F. Supp. 3d 1039 (S.D. Cal. 2019) ........................................................... 10

*Sebastian Int'l, Inc. v. Russolillo*,
    128 F. Supp. 2d 630 (C.D. Cal. 2001) ............................................................. 18

*Shamsky v. Garan, Inc.*,
    167 Misc. 2d 149 (N.Y. Sup. Ct. 1995) ........................................................... 25

*Silicon Knights, Inc. v. Crystal Dynamics, Inc.*,
    983 F. Supp. 1303 (N.D. Cal. 1997) ................................................................ 19

*Skydive Arizona, Inc. v. Quattrocchi*,
    673 F.3d 1105 (9th Cir. 2012) ................................................................... 14, 15

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ........................................................... 10, 11, 13

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ......................................................................... 2

*STX, Inc. v. Bauer USA, Inc.*,
    No. C 96-1140 FMS, 1997 WL 337578 (N.D. Cal. June 5, 1997) ................... 16

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007) ............................................................................ 11

*Timed Out, LLC v. Youabian, Inc.*,
    229 Cal. App. 4th 1001 (2014) ........................................................................ 21

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992) ......................................................................................... 4

*Ultrapure Sys., Inc. v. Ham-Let Grp.*,
    921 F. Supp. 659 (N.D. Cal. 1996) .................................................................. 16

*Waits v. Frito–Lay, Inc.*,
    978 F.2d 1093 (9th Cir.1992) ........................................................................... 4

*Wendt v. Host Int'l, Inc.*,
    125 F.3d 806 (9th Cir. 1997) ............................................................................ 5

*White v. Samsung Elecs. Am., Inc.*,
    971 F.2d 1395 (9th Cir. 1992) ...................................................................... 4, 5

*William H. Morris Co. v. Grp. W, Inc.*,
    66 F.3d 255 (9th Cir. 1995) ............................................................................ 14

*World Championship Wrestling v. Titan Sports, Inc.*,
    46 F. Supp. 2d 118 (D. Conn. 1999) ............................................................... 16

*Yeager v. Cingular Wireless LLC*,
    627 F. Supp. 2d 1170 (E.D. Cal. 2008) ................................................... 5, 9, 23

*Young v. Greystar Real Estate Partners, LLC*,
No. 318-CV-02149-BEN-MSB, 2019 WL 4169889 (S.D. Cal. Sept.
3, 2019................................................................................................23

## STATUTES

15 U.S.C. § 1114 .......................................................................8, 15

15 U.S.C. § 1125(a) ....................................................................3, 8

15 U.S.C. § 1125(c) .......................................................................15

15 U.S.C. § 1127 ............................................................................15

Cal. Bus. & Prof. Code, § 17204 ..................................................25

Cal. Civ. Code, § 3344(b)(1) ........................................................22

Cal. Civ. Code, § 954 ....................................................................16

## OTHER AUTHORITIES

Hehir, Jason,
*The Last Dance*, Episode 2, ESPN (2020).........................................22

McCarthy, J. Thomas,
Lanham Act § 43(a): The Sleeping Giant Is Now Wide Awake
(1996)........................................................................................8

McCarthy, J. Thomas,
Rights of Publicity and Privacy, 2d ed. (2019) ................................24

McCarthy, J. Thomas,
Trademarks and Unfair Competition § 27:53 (5th ed.) ...................13

## RULES

Fed. R. Civ. P. 15(a)(2)....................................................................3

Fed. R. Civ. P. 8(a) .........................................................................2

## I.     INTRODUCTION AND RELEVANT FACTS

The Upper Deck Company ("Upper Deck"), like other trading card manufacturers, strategically enters exclusive licensing partnerships with athletes to enhance and maintain its premium brand. Most notably, Upper Deck has a longstanding *exclusive* trading card contract with Michael Jordan, one of the most famous and easily recognizable celebrity athletes on the planet. *See* Compl., Intro., ¶¶ 3, 4, 11, 23-31. Jordan's name, image, and likeness, including his famous jersey number, 23, individually and in combination, are protectable trademarks that carry significant goodwill and consumer recognizability. *Id.* at ¶¶ 16-22.

Despite Defendant, Panini America, Inc.'s ("Panini"), awareness of the Upper Deck-Jordan contract, and its lack of any similar right to use Jordan's image, Panini recently began deliberately manipulating Jordan's image and likeness into its trading card products in an attempt to mislead consumers as to Jordan's affiliation with, or sponsorship of, Panini's products, to stimulate consumer interest in Panini's cards, lend on Jordan's brand equity and goodwill, and to harm Upper Deck's reputation as the exclusive home of Jordan trading cards. Compl. ¶¶ 6-8, 9-12, 32-43. Panini's use of Jordan's image and likeness on its trading cards harms Upper Deck in several ways. It undercuts Upper Deck's exclusive contract and the enormous resources spent to maintain that contract over several decades; it diverts consumer interest away from Upper Deck to Panini; it increases the volume of Jordan cards on the market; it disrupts Upper Deck and Jordan's ability to control the quality of Jordan cards in the market; and it undermines Upper Deck's goodwill as the exclusive manufacturer of Jordan trading cards. Compl. ¶¶ 53-55.

Ironically, when others infringed on Panini's exclusive agreement with Kobe Bryant, it echoed these same sentiments. Specifically, Panini claimed that Kobe Bryant's persona is "integral to the marketability" of the products at issue, that his appearance on products confuses consumers given his great recognizability, and that it is "potentially devastating to Panini's business reputation and goodwill if [the

PLAINTIFF THE UPPER DECK COMPANY'S OPPOSITION TO DEFENDANT PANINI
AMERICA, INC.'S MOTION TO DISMISS

exclusive license] is undermined by the presence of counterfeit or unauthorized goods in the market." *See Panini America, Inc. v. The Art of the Game*, Case No. CV11-03971RGK(AGRx) (CD Cal. 2011), ECF No. 1 at ¶¶ 20, 24, available at Request for Judicial Notice ("RJN"), Ex. 1 ; and RJN Ex. 2, ECF No. 5-1 (Panini moved for a Temporary Restraining Order on these same grounds).

Panini's Motion to Dismiss (ECF No. 12) ("MTD") contradicts nearly every assertion it made when protecting its rights. The MTD seeks to avoid certain liability here by arguing that Jordan's appearance in its trading cards is mere coincidence and, further, that his image on trading cards has no value and will not mislead consumers. Panini is wrong. As an initial matter, Panini ignores the controlling legal standard at this pleadings stage and simply disputes Upper Deck's allegations and associated evidence – that Panini purposefully captures Jordan's recognizable image in its products, that Jordan's image on the products is highly valuable, and that it causes confusion among consumers. Panini also ignores a host of binding Ninth Circuit precedent closely guarding celebrity value and providing legal recourse for infringing conduct analogous to Panini's. Instead, relying on a patchwork of district court and/or out of circuit authority, Panini attempts to rewrite the law in a way that permits it to creatively trade on Jordan's immense value and goodwill.

The Court should deny the MTD in its entirety or, alternatively, grant Upper Deck leave to amend.

## II. LEGAL STANDARD

The Federal Rules set forth a liberal pleading standard, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A complaint satisfies this standard where it "contain[s] sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and "the factual allegations that are taken as true [and reasonable inferences therefrom] plausibly suggest an entitlement to relief. . . ." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Indeed, a "complaint

1  may be dismissed only when defendant's plausible alternative explanation is so

2  convincing that plaintiff's explanation is implausible." *Id*.

3      If a court grants any part of a motion to dismiss, the plaintiff should receive

4  leave to amend. See Fed. R. Civ. P. 15(a)(2) and see *Lopez v. Smith*, 203 F.3d 1122,

5  1130 (9th Cir. 2000) (rejecting "defendants' reading [under which] legitimate claims

6  with curable defects would be dismissed without leave to amend.").

7  **III.   ARGUMENT**

8      **A.   Upper Deck Adequately States a Claim for Its First Cause of Action under Section 1125(a)**

9

10     As detailed in the Complaint, Panini's intentional, unlicensed, repetitive use

11 of Jordan's image and jersey number on its trading cards deceives consumers into

12 believing Jordan endorses the products and generates consumer interest in Panini's

13 trading cards. *See, e.g.,* Compl. ¶¶ 39-42. This constitutes false endorsement under

14 Section 1125(a)(1)(A) and false advertising under Section 1125(a)(1)(B). Panini's

15 distorted view of Upper Deck's Complaint and its disagreement with Upper Deck's

16 allegations cannot extinguish Upper Deck's meritorious claims.

17     *1.   Upper Deck Adequately States a Claim under Section 1125(a)(1)(A)*

18

19     Panini claims Upper Deck fails to allege that its trading cards are likely to

20 cause consumer confusion as to Jordan's endorsement of the products. MTD, 4-9.

21 To arrive at this conclusion, Panini ignores the scope of actionable marks at issue

22 here – namely Jordan's world renowned image – and then disputes the alleged

23 consumer perception of that image while grasping for support from inapt, out of

24 circuit cases. Panini's MTD fails for the reasons discussed below.

25     **a.   Courts Consistently Recognize a Celebrity's Image May Serve as a Protectable Trademark Under 1125(a)(1)(A)**

26

27     Section 1125(a) protects registered and "qualifying unregistered" marks from

28 unauthorized uses likely to cause consumer confusion. *Two Pesos, Inc. v. Taco*

1  *Cabana, Inc.*, 505 U.S. 763, 768 (1992).  In cases involving famous, celebrities, like

2  this one, "the term 'mark' applies to the celebrity's persona [or identity]. . . ."

3  *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007 (9th Cir. 2001); *see also White*

4  *v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992), *as amended* (Aug.

5  19, 1992) (protecting TV personality, Vanna White's persona under Section

6  1125(a)(1)(A)).  Protectable persona broadly includes "visual likeness, vocal

7  imitation, or other uniquely distinguishing characteristic[s]. . . ." *Abdul-Jabbar v.*

8  *Gen. Motors Corp.,* 85 F.3d 407, 410 (9th Cir. 1996) (protecting voice of NBA

9  legend Kareem Abdul-Jabbar).   Simply put, this Circuit recognizes false

10  endorsement claims for misuse of a celebrity's persona that is "implied through the

11  imitation of a distinctive attribute of the celebrity's identity. . . ." *Fifty-Six Hope Rd.*

12  *Music, Ltd. v. A.V.E.L.A., Inc.,* 778 F.3d 1059, 1068 (9th Cir. 2015) (*citing Waits v.*

13  *Frito–Lay, Inc.,* 978 F.2d 1093, 1110 (9th Cir.1992)).[1]

14       As one of the most famous and recognized athletes in the history of sports,

15  Jordan's image and likeness, as well as his jersey number, 23, alone and in

16  combination, are valid, enforceable trademarks.  *See* Compl. ¶¶ 16-21.

17    **b.    Panini's Use of Jordan's Persona On Its Trading Cards**

18    **Causes Consumers To Believe Jordan Endorses The**
     **Products**

19       Courts in this Circuit assess the merits of the likelihood of confusion for

20  celebrity false endorsement claims by adapting the eight-factor *Sleekcraft* test to

21  look at things like the celebrity's level of recognition among the defendant's

22  customers, relatedness of the product to the celebrity's fame, similarity of the

23  likeness used by defendant, and actual consumer confusion. *Downing*, 265 F.3d 994,

24  1008-09, *citing AMF v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979).  "Although

25  these are all factors that are appropriate for consideration in determining the

26

27

28  [1] *Waits* was abrogated on other grounds in *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118 (2014) but remains good law for present purposes.

1   likelihood of confusion, they are not necessarily of equal importance, nor do they
2   necessarily apply to every case." *Downing,* 265 F.3d at 1008.

3          Given the predominantly factual nature of this eight-part test, courts routinely
4   reject summary judgement as well as pleadings attacks on false endorsement claims.
5   *Id.* For example, *Downing* reversed summary judgment on famous surfers' false
6   endorsement claims against a clothing manufacturer holding that a jury could find
7   several factors of this test favor the plaintiffs. *Id.* Similarly, the Ninth Circuit
8   overturned summary judgment on false endorsement clams by TV personality Vanna
9   White stemming from defendant's use of a robot in its TV commercials bearing a
10  resemblance to White, finding the likelihood of confusion inquiry ripe for a jury.
11  *White*, 917 F.2d 1395, 1401; and *see Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 812 (9th
12  Cir. 1997) (district court erred in failing independently to analyze relevant likelihood
13  of confusion factors from consumers' standpoint regarding whether appellants
14  sponsored, approved of, or were otherwise associated with the Cheers bars).

15         Consistent with these Ninth Circuit authorities, the Central District recently
16  rejected a bicycle manufacturer's motion to dismiss false endorsement claims arising
17  out of its use of "Farley" on a line of large bikes brought by the licensee of comedy
18  actor Chris Farley. *Make Him Smile, Inc. v. Trek Bicycle Corp.,* No. 2:17-CV-
19  07136-RGK-KS, 2018 WL 5986983, at *5 (C.D. Cal. Jan. 18, 2018). The court
20  correctly noted that the defendant's motion merely "dispute[ed] whether a likelihood
21  of confusion truly exists" and attacked the truth of the plaintiff's allegations rather
22  than stating a valid grounds for dismissal under Rule 12. *Id.* and *see Fifty-Six Hope*
23  *Rd. Music*, 778 F.3d 1059, 1072 (upholding false endorsement jury verdict for
24  licensee of Bob Marley based on facts presented at trial); *Yeager v. Cingular*
25  *Wireless LLC*, 627 F. Supp. 2d 1170, 1176 (E.D. Cal. 2008) (rejecting pleadings
26  attacks on false endorsement claims by a famous pilot). Panini fails to analyze the
27  eight factor test applicable here and ignores binding Ninth Circuit precedent.

28

Upper Deck's allegations in the Complaint readily demonstrate that Panini's use of Jordan's image on trading cards likely causes consumer confusion about Jordan's endorsement, sponsorship, approval of, or affiliation with, the Panini products under the adapted *Sleekcraft* test. Among other things, Upper Deck alleges that: (1) Jordan is the most recognizable athlete in the world (¶¶ 16-22); (2) Jordan's fame as a basketball player relates to Panini's use of his image on its basketball trading cards (¶¶ 16-23); (3) Panini uses Jordan's actual image on its cards coupled with other elements closely associated with Jordan such as his jersey number 23, Bulls' team colors, and his most famous teammates (¶¶ 9-10, 37-38); (4) industry publications and trading card consumers took notice of Jordan on the Panini cards and even titled the cards "Jordan cards," and Panini's acts "deceive as to the affiliation, connection right to use, or association of Panini with Jordan and as to the origin sponsorship, or approval of Panini's products…by Jordan"  (¶¶ 42, 62); (5) Upper Deck and Panini's trading cards are sold in overlapping marketing channels on primary and secondary markets (¶¶ 22, 26); (6)  there exists an enormous consumer appetite for Jordan trading cards (¶ 42); and (7) Panini's use of Jordan in the background of its products is intentionally designed to capture the value of associating with Jordan (¶¶ 9-10, 34-43), has successfully captured that value in consumers' minds (¶ 42); and Panini acted deliberately, selecting the most sought after athlete for inclusion in its basketball trading card product lines (¶¶ 33-41). *See Fifty-Six Hope*, 778 F.3d at 1069 (enumerating factors).

Panini unsuccessfully attempts to maneuver around these allegations. First, Panini feigns confusion over what "marks" are at issue, glossing over the well-established principle that celebrity persona is a protectable mark. *See* MTD, 4-5. In so arguing, Panini overlooks its clear use of Jordan's image and identity (i.e. the pictures of Jordan) on its trading cards that, especially when coupled with his famous

1  number 23 and traditional team colors and team name, leaves no doubt in consumers'
2  minds that Panini's cards feature Jordan's famous image.[2]

3       The remainder of Panini's attacks on Upper Deck's false endorsement claim
4  dispute the facts alleged in the Complaint. MTD, 5-9. For example, Panini claims
5  the Jordan's marks are not "visible to the naked eye." MTD, 6. Not so. Panini
6  intentionally featured Jordan's image on the card and consumers have in fact taken
7  notice. Compl. ¶¶ 34-37, 42, and *see* fn. 16, *infra*. Ironically, after going out of its
8  way to adjust the frame of the Pippen card to capture and benefit from Jordan's
9  likeness, Panini now tells the Court that its adjustment served no purpose at all and
10 that Jordan is not visible or valuable. *Id.* The image below reflects Panini's
11 manipulation  (green box is the Pippen-Jordan card and red is the earlier original):



22       Panini also contends that it has not used Jordan's name to advertise or promote
23 its products, but this too contradicts alleged facts. Compl. ¶ 39 (the inclusion of

[2] To be clear, Upper Deck is not claiming it has rights to any NBA team logo or
jersey, like the Bulls. Much like Panini, Upper Deck has no right to make a card with
both (1) Jordan and (2) a Bulls' jersey. The Bulls' rights belong to Panini, and
Jordan's to Upper Deck. Hence, the fact that no Jordan Bulls card has been made in
over a decade. *See* Compl. ¶ 25. Panini is also mistaken when it claims that Upper
Deck has not made Jordan trading cards since the early 1990's. MTD, 5:17-19.
Upper Deck does make Jordan trading cards, just not with him in a Bulls' uniform,
hence the exclusive license with Jordan to make trading cards. Compl. ¶ 22.

Jordan draws interest in Panini's products and increases their value), ¶ 42 (Panini's inclusion of Jordan's image on its cards "caused an industry-wide media frenzy" and media reports "commenting on Jordan's appearance on Panini's new product line."). Panini's opinions on likelihood of confusion from the Rodman Card (MTD, 6) once again contradict alleged facts (Compl. ¶¶ 38-39).

After disputing the alleged facts, Panini goes one step further, boldly asserting that it can make an unlicensed Jordan trading card without violating the Lanham Act. MTD, 6 ("Even if Jordan . . . was prominently featured in the card, his image would not constitute a trademark"). Panini's strained, multi-page discussion of dated, out-of-circuit authorities does not make it so. MTD, 6-9.[3]

Panini primarily relies on *Pirone v. MacMillan, Inc.* a 30-year-old false designation of origin case involving a registered name mark ("Babe Ruth") that has little relevance to Upper Deck's false endorsement claim relating to Jordan's persona. *Pirone*, 894 F.2d 579, 582, fn. 1 (2d Cir. 1990) (asking whether Ruth's name "is likely to create confusion as to origin of the goods"). While issued in 1990, *Pirone* relied on the 1946 version of Section 1125(a), ignoring the substantial amendments made in 1989 to expand protections beyond false origin. *Cf Pirone*, 894 F.2d 579, fn. 1 (setting out text of Section 1125(a)) and 15 U.S.C. § 1125(a) (1946).[4]

Unsurprisingly given the statutory language at issue, *Pirone* makes no mention of the governing *Sleekcraft* test that applies here. *See generally Pirone*, 894 F.2d 579. Still further, the bulk of the language from *Pirone* Panini relies on relates to trademark counterfeiting under 15 U.S.C. § 1114, not Section 1125(a). *Id.* at 383-

---

[3] Likely realizing it cannot succeed in light of the well-established authorities from this circuit, Panini simply ignores them. *See* pp. 3-5 above for discussion of same.

[4] Also, *see* McCarthy, Lanham Act § 43(a): The Sleeping Giant Is Now Wide Awake (1996), at p. 1, fn. 1 comparing 1946 version of Section 1125(a) [i.e. Lanham Act section 43(a)] with later versions, available at: https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=4322&context=lcp.

84 (discussing section 1114 before moving on to 1125).[5] Simply put, this dated, out of circuit, case resting on dated or inapplicable statutes cannot assist Panini here.

Panini's other authorities fair no better. As Panini acknowledges, *ETW Corp. v. Jireh Pub., Inc.* never reached the central issue here[6] – the *Sleekcraft* test for false endorsement – in light of First Amendment defenses not raised by Panini in its MTD. 332 F.3d 915, 925-27 (6th Cir. 2003). In fact, *ETW's* passing statement that celebrity identity must be used in a way such that consumers are likely to be misled about sponsorship or approval is consistent with Upper Deck's allegations. *Id.* at 925-26. *Fleischer Studios, Inc. v. A.V.E.L.A., Inc*., 925 F.Supp.2d 1067, 1070-78 (C.D. Cal. 2012) narrowly addressed a registered word mark for "Betty Bop" and held the defendant's use of that word mark was functional and fair use, therefore skipping any likelihood of confusion analysis. *Cairns* found insufficient evidence of likelihood of confusion at the summary judgement stage and gave less weight to deceased celebrity's endorsement rights. *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1215-21 (C.D. Cal. 2000). *Balsley v. LFP, Inc.*, which does not involve a section 1125(a) claim, addressed magazine publications of attractive news women along with historical information about their news careers that clearly appeared in the magazine as reader submissions. The court found these historical, informational accounts did not "take advantage of [Basley's] reputation, prestige, or other value." No. 1:08 CV 491, 2010 WL 11561844, at *9 (N.D. Ohio Jan. 26, 2010).  The same

---

[5] *Pirone* is often distinguished and limited in its application in modern-era cases. *Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc*., No. 10 CV 2333 KMW, 2013 WL 822173, at *20 (S.D.N.Y. Mar. 6, 2013) ("However, *Pirone* is distinguishable from this case: while Babe Ruth's likeness appeared as one of many photographs of baseball players, AVELA's t-shirts feature only an image of Bruce Lee; indeed, this image is the primary reason a consumer would decide to purchase the t-shirt."); *Estate of Smith v. Cash Money Records, Inc.,* No. 14CV2703, 2018 WL 2224993, at *7 (S.D.N.Y. May 15, 2018); *Nova Wines, Inc. v. Adler Fels Winery LLC*, 467 F. Supp. 2d 965, 977 (N.D. Cal. 2006)(distinguishing Ruth and Tiger cases as ones attempting to equate likeness or image as a trademark or source of origin).

[6] Cases that reached the eight-factor test at the MTD phase rejected the pleadings attacks. *See e.g. Make Him Smile, Inc.*, 2018 WL 5986983, at *5; *Yeager*, 627 F. Supp. 2d at 1176.

is not true here. Panini blatantly takes advantage of Jordan's prestige and marketability. Compl. ¶¶ 9-12.

Panini's underdeveloped, passing attempt to establish normative fair use fails because this defense requires there be no suggestion of sponsorship or endorsement by the owner of the mark. MTD, 8; *New Kids on the Block v. News Am. Publ'g., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992). Upper Deck robustly alleges Panini's actions suggest Jordan's endorsement to consumers as outlined above. These allegations must be taken as true, thus Panini's MTD fails.[7]

### 2.     *Upper Deck Adequately States a Claim under Section 1125(a)(1)(B)*

Panini challenges three of five elements necessary to state a claim for false advertising under section 1125(a)(1)(B). MTD, ECF No. 12, 9-12; and *see San Diego Cty. Credit Union v. Citizens Equity First Credit Union*, 360 F. Supp. 3d 1039, 1052 (S.D. Cal. 2019) (Curiel, J.). The Court should dismiss these erroneous attacks on Upper Deck's pleadings for the reasons detailed below.

### a.     Panini's Representations Regarding Its Affiliation with Jordan Are False and Misleading

Under the Lanham Act, an actionable false statement is one that is literally false, either on its face or by necessary implication, or literally true but likely to mislead or confuse consumers. *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139-40 (9th Cir. 1997). For literal falsity, courts evaluate "the message conveyed in full context" to determine if "consumer[s] will necessarily and unavoidably receive a false message. . . ." *Nutrition Distribution LLC v. PEP Research, LLC*, No. 16CV2328-WQH-BLM, 2019 WL 652391, at *4 (S.D. Cal. Feb. 15, 2019) (*citing Southland*, 108 F.3d 1134, 1139). Otherwise stated, "[i]f the words or images, considered in context, necessarily imply a false message, the

---

[7] Nearly all of Panini's authorities address motions for summary judgement with the benefit of developed factual records, further distinguishing them.

advertisement is literally false, and no extrinsic evidence of consumer confusion is required." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144 (2d Cir. 2007).

For non-false, literally true statements, the Lanham Act bars advertisements that mislead, confuse, or deceive consumers. *Southland*, 108 F.3d 1134, 1140. False advertising reaches situations beyond literal falsehoods because "[w]ere it otherwise, clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed." *Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.,* 911 F.2d 242, 245 (9th Cir. 1990)). Courts broadly search for statements that mislead or confuse consumers in light of the Lanham Act's intent to serve as a federal unfair competition law. *Cf. Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1272-73 (10th Cir. 2000). And, broadly extending protections is necessary because "corporations cultivate their images and values through a wide array of activities, including celebrity endorsements, sponsorships, and charitable giving." *Id.* and *see Jordan v. Jewel Food Stores, Inc*., 743 F.3d 509, 518 (7th Cir. 2014) (also recognizing that "advertising occupies diverse media, draws on a limitless array of imaginative techniques, and is often supported by sophisticated marketing research. It is highly creative, sometimes abstract, and frequently relies on subtle cues.").

Importantly here, "the question of whether a particular statement is false and misleading is a question of fact that is inappropriate for adjudication on a motion to dismiss." *Instant Checkmate, Inc. v. Background Alert, Inc.*, No. 3:14-CV-01182-MMA-DHB, 2014 WL 12526275, at *5 (S.D. Cal. Dec. 5, 2014) (*citing Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008)).

Jordan's inclusion in Panini's cards is a false and misleading statement about Panini's products and commercial activities. Jordan's brand is the most recognizable and valuable in all of professional sports and only Upper Deck may include Jordan's image in trading cards. Compl. ¶¶ 11, 12, 20. Recognizing this, Panini repeatedly placed Jordan's image into its basketball card lines to increase interest in its products

and enhance its brand equity and goodwill. *Id.* at ¶¶ 9, 10, 39, 41, 51. Panini's periodic inclusion of Jordan in its products drives interest in all of its products as consumers clamor for the chance to obtain these valuable cards. *Id.* at ¶ 22. Thus, Panini misleads consumers by misrepresenting that Jordan authorizes its products, when he does not. *Id.* at ¶¶ 10, 12, 42, 62.

Panini's MTD argues with these allegations, claiming the images of Jordan on the cards accomplishes no more than showing that Jordan "was a player on the basketball court when the photographs were taken." MTD, 11. This misunderstands the nature of a motion to dismiss and ignores Upper Deck's allegations. The argument is also disingenuous. If Jordan's appearance is so trivial and matter of fact, why does Panini edit its frame to capture his entire upper torso along with his famous 23 jersey number in each instance?[8] And why have so many consumers taken notice? Panini's manipulation of the cards to creatively capture Jordan's persona and image is precisely the type of clever innuendo or ambiguous suggestion that amounts to false advertising. *See Cook, Perkiss & Liehe, Inc.* 911 F.2d at 245.

Panini also ignores the allegations in the Complaint that go beyond the two trading cards featuring Jordan. By repeatedly placing Jordan in its trading cards lines, Panini garners considerable brand value, elevating all of its products and the goodwill associated with its company. And, conversely, Upper Deck loses the exclusive associational value with Jordan that it built up over many years. *See,* Compl. ¶¶ 10-12, 23, 29, 39-42; *see e.g., Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1273 (10th Cir. 2000) (Section 1125(a)(1)(B) "permit[s] actions based on misrepresentations about commercial activities *as well as goods and services*." [emphasis added]). Thus, it is not merely a matter of a background image in two

---

[8] *See e.g.* discussion at pp. 23-24 below regarding *In re NCAA* where the Ninth Circuit shut down a similar argument by a video game manufacturer who went to great lengths to accurately depict and feature famous athletes in its product, but after being sued claimed the athletes' appearance added no value.

cards, but instead a statement about Panini and Upper Deck's brands and their association with the most famous athlete in history. Compl. ¶ 20.

The district court decisions[9] Panini relies on do not advance its argument. MTD, 10-11. For starters, Panini's principal case, *Gibson*, did not hold false advertisement claims relating to the use of an actual photograph "could not be actionable." *Id.* Instead, it refused to enter summary judgment *for the plaintiffs*, finding that the defendant raised triable issues as to whether the use of the photos mislead consumers. *Gibson v. BTS N., Inc.*, No. 16-24548-CIV, 2018 WL 888872, at *4 (S.D. Fla. Feb. 14, 2018). The other cases are of limited value because they address factually distinct traditional advertising campaigns by camera companies, food manufacturers, and clothing designers, not the type of creative or clever advertising Panini undertakes. MTD, 10-11. Tellingly, Panini ignores more factually analogous cases from this circuit supporting Upper Deck's false advertising claims. *See e.g. PhotoMedex, Inc. v. Irwin*, 601 F.3d 919, 932 (9th Cir. 2010) (overturning grant of summary judgment on false advertising claims involving promotion of a medical device that misleadingly claimed the defendant was the inventor of the product when in fact he invented only some of the core components). *Southland*, 108 F.3d 1134, 1144 (addressed literal falsity of a chart that, while accurate in one sense, could reasonable lead a jury to conclude that it "intended to represent" something not true); McCarthy on Trademarks and Unfair Competition § 27:53 (5th ed.) ("plaintiff must provide evidence establishing what message is conveyed by the challenged advertising and that that message is likely to deceive buyers.").

### b.   <u>Tendency to Deceive Is Presumed and Alleged</u>

Panini's argument relating to consumer deception is legally and factually flawed. MTD, 11. Legally, Panini asserts that there is no presumption of deception here. This is wrong because this case is about a literally false (by implication) statement. In any case, this circuit applies a presumption of deception to false

---

[9] Tellingly, the vast majority of these cases are summary judgment decisions.

advertising cases involving intent to deceive consumers. *See e.g. William H. Morris Co. v. Grp. W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) (Because "[defendant] intentionally misled consumers [via literally true statements], we would presume consumers were in fact deceived and [defendant] would have the burden of demonstrating otherwise."); and *see Merck Eprova AG v. Gnosis S.p.A.,* 760 F.3d 247, 259 (2d Cir. 2014).[10] Factually, "at the pleading stage the plaintiff need only allege specific misleading statements and explain why they are misleading." *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 636 (N.D. Cal. 2019). Plaintiff has done so here. *See* Compl. ¶¶ 12, 41, 42.

c.    **Panini's Decision to Place Jordan in Its Cards Is Material**

Panini's use of Jordan in its products is material. Statements are material if they are "likely to influence consumers' purchasing decisions" especially where there is resulting actual confusion. *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1111 (9th Cir. 2012); and *see  Cook, Perkiss, & Liehe, Inc*., 911 F.2d at 244 ("deception is material, in that it is likely to influence the purchasing decision. . . ."). Additionally, a plaintiff establishes materiality by showing "that the defendants misrepresented an inherent quality or characteristic of the product." *POM Wonderful LLC v. Purely Juice, Inc.*, No. CV-07-02633CAS(JWJX), 2008 WL 4222045, at *11 (C.D. Cal. July 17, 2008) (*citing Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc*., 299 F.3d 1242 (11th Cir.2002)).

Here Panini's use of Jordan in its trading cards is both likely to influence purchasing decisions and it misrepresents an inherent quality of its goods. Compl. ¶¶ 9-12, 22, 39, 41, 42, 51.  Panini intended to capture value from Jordan's inclusion in the products and succeeded. The media and consumers caught on and now demand higher prices when reselling the Panini "Jordan cards." *Id.* at ¶ 42.

---

[10] Panini erroneously cites the *Appliance Recycling Centers of Am., Inc. v. JACO Envtl., Inc.*, 378 F. App'x 652, 655 (9th Cir. 2010) for the opposite result, but this case too recognizes that intentional deception triggers a presumption of deceit.

Panini's arguments to the contrary are unavailing. Panini claims consumers calling its cards "Jordan cards" somehow exonerates it under a materiality analysis or misplaces blame on Panini. MTD, 12. Quite the opposite is true. Consumers' belief the cards are "Jordan cards" is precisely the confusion that makes Panini's use material. *Skydive Arizona*, 673 F.3d at 1111 (emphasizing actual evidence of consumer confusion to uphold false advertising verdict); *Cook, Perkiss & Liehe,* 911 F.2d at 245. Its additional argument about after-the-fact visibility of Jordan on the products equally fails. Panini's repeat use of Jordan on the cards instills in consumers' minds that they may draw a Jordan card from the pack upon purchase and creates the chase for Panini's products irrespective of whether or not one can be sure to receive a Jordan card upon purchase. Compl. ¶¶ 39, 51. Taken to its logical extreme, Panini's position puts all trading card activity outside the scope of false advertising because packs of cards are sold "blind" with no way of foreseeing what athletes one may draw upon purchase.

## C.   Registered Trademark Infringement and Dilution

Panini contends that Upper Deck, as an exclusive trading card licensee, has no standing to enforce Section 1125(c) dilution and 1114 trademark infringement claims. MTD, 12-14. This is wrong.

Panini's separate treatment of the two sections makes little sense. Section 1114 grants standing to the "registrant" of the mark, a defined term including the registrant and its assignees, and section 1125(c) grants standing to the "owner" of the mark, an undefined term. *See* 15 U.S.C. §§ 1114, 1125(c), 1127 (relevant statutes and definitions); and *see Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.,* 339 F. Supp. 2d 944, 958-61 (W.D. Mich. 2004) (collecting cases and treating Section 1114 and 1125(c) the same for standing purposes). Panini provides no analysis explaining why "owner" and "registrant" are distinct concepts.

Despite Panini's narrow interpretation of Lanham Act standing, courts routinely permit exclusive licensees to pursue both Section 1114 and 1125(c) claims

*in the right context*. In this circuit, it is the majority approach despite Panini's contrary claims. *Halcyon Horizons, Inc. v. Delphi Behavioral Health Grp., LLC*, No. 17-CV-00756-JST, 2017 WL 1956997, at *3 (N.D. Cal. May 11, 2017) ("most district courts in this circuit have concluded that an exclusive licensee of a federal trademark *can* have standing."). Standing exists where the license is exclusive and the licensee is free to enforce the trademarks at issue. *See Ultrapure Sys., Inc. v. Ham-Let Grp.*, 921 F. Supp. 659, 666 (N.D. Cal. 1996) (*citing G.H. Mumm Champagne v. Eastern Wine Corp.,* 142 F.2d 499 (2nd Cir.1944), *cert. denied,* 323 U.S. 715 (1944)). In line with these cases, Upper Deck's exclusive trading card license with Jordan includes an assignment of rights to commence actions for infringing use of Jordan's rights. Compl. ¶¶ 27, 50, 94, 99.

Panini's arguments about standing and licensees also misses a more basic premise, that "[w]ith the exception of causes of action of a personal nature, such as injuries arising out of tort, a cause of action is assignable." *Bd. of Trade of San Francisco v. Swiss Credit Bank*, 728 F.2d 1241, 1243 (9th Cir. 1984) (*citing* Cal. Civ. Code § 954 [permitting an "owner" to transfer rights]). Jordan assigned the right to commence this action against Panini to Upper Deck. Compl. ¶¶ 27, 50, 94, 99. In this way, this is not a case where Upper Deck's "ability to enforce the trademarks is restricted by contract," like the cases relied on by Panini. *See e.g. STX, Inc. v. Bauer USA, Inc.*, No. C 96-1140 FMS, 1997 WL 337578, at *3 (N.D. Cal. June 5, 1997); and *see  World Championship Wrestling v. Titan Sports, Inc.*, 46 F. Supp. 2d 118 (D. Conn. 1999) (properly recognizing *STX* as a fact-specific case and refusing to dismiss claims based on standing). For the same reason, based on the facts here, there is no good reason to adopt the minority view of limited standing expressed in *STX*, *Lasco Fittings*, or *Innovation Ventures* (*see* MTD, 13-14).

### D.    Upper Deck Adequately Alleges Business Tort Theories

Intentional interference with prospective economic and contractual relations largely require Upper Deck to prove similar elements. *Pacific Gas & Electric Co. v.*

PLAINTIFF THE UPPER DECK COMPANY'S OPPOSITION TO DEFENDANT PANINI
AMERICA, INC.'S MOTION TO DISMISS

*Bear Stearns & Co.*, 50 Cal.3d 1118, 1126 (1990) (noting the chief practical difference between these theories is that a broader range of privilege to interfere is recognized when the relationship interfered with is only prospective); *see also, Korea Supply Co. v. Lockheed Martin Corp*, 29 Cal. 4th at 1134, 1157 (2003). The California Supreme Court set forth the elements for each claim in *Korea Supply Co.*, and *Quelimane Co. v. Stewart Title Guar. Co*., 960 P.2d 513, 530 (Cal. 1998) respectively. Here, Panini disputes the sufficiency of Upper Deck's pleadings on the elements of actual disruption, intended disruption, and an independently wrongful act. MTD, 14-19. Panini is wrong on all counts.

### 1. Panini's Conduct Disrupted Upper Deck's Exclusive Licensing Agreement to Upper Deck's Detriment

Panini's unauthorized use of Jordan on trading cards disrupted Upper Deck's exclusive trading card license with Jordan and harmed Upper Deck. Panini cannot credibly dispute this. When it filed suit to stop infringing use of one of its exclusive athletes (Kobe Bryant), Panini admitted it is "devastating to Panini's business reputation and goodwill if even one athlete's grant of an exclusive license to Panini is undermined by the presence of counterfeit or unauthorized goods in the market." RJN, Ex. 1, ¶ 20 (Panini Complaint in *Panini v. Art of the Game*). Upper Deck agrees. Panini's use of Jordan in its trading card products despite Upper Deck and Jordan's longstanding exclusive relationship attempts to confuse consumers about Panini and Jordan's affiliation. This harms Upper Deck's reputation as the exclusive home of Jordan products and the expected goodwill, brand value, and consumer interest flowing from this exclusive relationship. Compl. ¶¶ 10-11. Undermining the exclusivity component of the Upper Deck-Jordan agreement dilutes the value of the contract to Upper Deck and dilutes the consumer market for Jordan cards. *Id.* at ¶¶ 84-85. Further, Panini's actions interfere with Upper Deck's ability to control the quality, type, and quantity of Jordan trading cards coming to market, as well as the number of companies consumers associate with Jordan's brand. *Id.* at ¶¶ 84-85, 91.

PLAINTIFF THE UPPER DECK COMPANY'S OPPOSITION TO DEFENDANT PANINI AMERICA, INC.'S MOTION TO DISMISS

Panini's arguments that interruption of an exclusive agreement amounts to no actionable disruption or harm ignores not only its own prior allegations, but also well-established principles of harm to celebrity brands. "[H]ighly sought after as a celebrity endorser[s]," can and must "guard[] the use of [their] identity very closely. . . ." *Jordan v. Jewel Food Stores, Inc*., 743 F.3d 509, 513 (7th Cir. 2014). A multitude of laws exist to compensate for loss of celebrity goodwill and future publicity value. *See Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1256 (9th Cir. 1997). Indeed, it should be undisputed that celebrity endorsement value diminishes with use. *See Grant v. Esquire, Inc*., 367 F. Supp. 876, 881 (S.D.N.Y. 1973);. *Doe v. McFarlane*, 207 S.W.3d 52, 64-66 (Mo. Ct. App. 2006) (negative or over association with certain brands tarnishes celebrities' endorsement value); *cf. Perkins Sch. for the Blind v. Maxi-Aids, Inc.,* 274 F. Supp. 2d 319, 324 (E.D.N.Y. 2003) (absence of quality control procedures creates consumer confusion), and *see* RJN, Ex. 2 (Panini averring the same for its own exclusive athletes).

Courts routinely find the type of disruption and harm encountered here actionable under intentional interference claims. Damage to business reputation and goodwill disrupt a contract. *See Behr Process Corp. v. RPM Int'l Inc.*, 2014 WL 12584385, at *2–4 (C.D. Cal. May 20, 2014); *LifeScan, Inc. v. Am. Health Care, Inc.,* No. C 05-2016 JSW (MEJ), 2007 WL 9753667, at *6 (N.D. Cal. June 5, 2007) (recognizing "harm to its business reputation and goodwill" as colorable disruption). Damage to a product or brand's "premium appeal" is actionable in this context. *Sebastian Int'l, Inc. v. Russolillo*, 128 F. Supp. 2d 630, 637 (C.D. Cal. 2001). Likewise, creating infringing products that saturate the market for one's goods constitutes disruption. *See Brackett v. Hilton Hotels Corp.,* 619 F. Supp. 2d 810, 823 (N.D. Cal. 2008) (Market for small-run art prints "depended upon the existence of a

PLAINTIFF THE UPPER DECK COMPANY'S OPPOSITION TO DEFENDANT PANINI AMERICA, INC.'S MOTION TO DISMISS

1    limited number of prints and [plaintiff] has alleged that that market suffered as a

2    result of defendants' actions [in mass producing the art without permission].").[11]

3          Indeed, a court recently dismissed almost identical pleadings challenges to the

4    same causes of action by Upper Deck against another trading card manufacturer

5    making unlicensed Jordan trading cards. The court denied the motion to dismiss

6    finding sufficient Upper Deck allegations that "it suffered a reduction in expected

7    sales, a drop in its trading cards' value, and a diminution of goodwill in Upper Deck

8    and its products." *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-CV-3200-

9    N-BT, 2020 WL 819392, at *3 (N.D. Tex. Feb. 19, 2020).

10         The same result in *Leaf* should follow here. Upper Deck alleges that Panini

11   disrupted its exclusive license by introducing unlicensed competing products

12   causing a dilution of the contract's value, loss of goodwill, and loss of product value

13   based on the additional, competitive goods in the market. State and federal law

14   strongly protect celebrity endorsement value and goodwill and recognize harm

15   flowing from a violation of these important rights. Panini confirms the above in suits

16   involving its own rights, but wants to claim no harm or disruption occurs when it

17   inflicts the same injury on other trading card manufacturers. Panini cannot have it

18   both ways; this disingenuous argument should be dismissed.

19         Panini's final argument regarding Jordan in a Bulls' jersey falls flat for the

20   reasons discussed above. *See* fn. 2 above. Upper Deck's lack of rights to Bulls'

21   trademarks does not grant Panini the right to feature Jordan on a card so long as he

22   wears a Bulls uniform. Under this logic, Upper Deck would be immune from suit by

23   Panini for featuring a Bulls jersey on its cards so long as Jordan is the one wearing

24   it because Panini has no right to complain about the use of Jordan.  Even further,

25

---

26   [11] *AlterG, Inc. v. Boost Treadmills LLC*, does not change this. It addressed alleged
     disruption to a supply contract where the plaintiff failed to allege "the supply was
27   actually disrupted" and admitted continual serve as the supplier. 388 F. Supp. 3d
     1133, 1152 (N.D. Cal. 2019). Similarly, *Silicon Knights, Inc. v. Crystal Dynamics,
28   Inc.*, where the plaintiff "[did] not state how the Activision contract" at issue was
     disrupted, does not assist Panini. 983 F. Supp. 1303, 1310 (N.D. Cal. 1997).

Panini's erroneous argument would create a license to use Jordan's identity rights without his knowledge, permission or any compensation, simply because Panini purchased separate rights for Bulls logos.  Notably absent from Panini's MTD is any reference to its NBA license that encompasses Jordan's rights, because such rights do not exist for Panini and are exclusive to Upper Deck.

### 2.    *Panini Intended this Disruption*

Panini's own admissions once again doom its arguments relating to intent to disrupt. Panini avers to the devastating impact of infringing products featuring a trading card manufacturer's exclusive athlete and that exclusive agreements of this sort are well-known and extensively publicized. Panini Compl., RJN Ex. 1, ¶¶ 20-21. Indeed, Panini pursued intentional interference claims stemming from another company's analogous, unlicensed use of Kobe Bryant's rights. *Id.* at ¶¶ 77-87.

Given Panini's knowledge of the devastating impact of its use, it can hardly argue here that it had no knowledge that its actions would disrupt Upper Deck's contract or that disruption was not "known to [Panini] to be a necessary consequence of [its] action" when creating Jordan cards. *Korea Supply*, 29 Cal. 4th at 1155-56. In any case, Upper Deck alleges this is true. Compl. ¶ 82 (Panini knew of Jordan exclusive), ¶ 83 (Panini knows its conduct diminishes the value of the exclusive and interferes with Upper Deck and Jordan's relationship), ¶ 89 (Panini's carefully chosen card design intends to highlight Jordan), ¶¶ 44-52 (those in the industry know the power of peripheral imagery on trading cards), ¶ 6 (as a competitor of Upper Deck, Panini enters exclusive agreements of its own and understands their value and the result of disruption of that value), ¶¶ 7-10 (Panini uses Jordan's likeness to increase its brand value and consumer interest in its cards). Panini's attempt to downplay Upper Deck's allegations and its ironic walk-back of its own allegations before other courts cannot defeat these well plead claims. Nor does the Bulls jersey alter this analysis as repeatedly addressed above. MTD 17-19.

### 3.     *Panini's Acts Were Wrongful*

Panini's final argument that there is no independently wrongful act hinges on dismissing all of Upper Deck's other claims without leave to amend. *See* MTD, 9. This is incorrect for the reasons explained in this Opposition.

**E.     Right of Publicity Claims Easily Survive Panini's Shallow Attacks**

Panini makes several meritless arguments in an attempt to avoid liability for its egregious attempt to profit off of Jordan's likeness. California's common law and statutory right of publicity permit no such avoidance.[12]

### 1.     *Jordan Can and Did Assign Right of Publicity Claims*

Upper Deck has standing to pursue Panini's use of Jordan's image on trading cards. As an initial matter, Jordan can assign right of publicity claims. *See Timed Out, LLC v. Youabian, Inc*., 229 Cal. App. 4th 1001, 1008 (2014). The exclusive versus non-exclusive licensee analysis that Panini principally relies on has been overruled and, separately is not relevant here, where there is an assignment of rights. *Id.* at fn. 6 (criticizing Panini's *Upper Deck* authority as an "error"). Upper Deck alleges assignment here.  Compl. ¶¶ 27, 50, 94, 99.

Panini's redundant attempt to immunize its infringing conduct because it features Jordan *in a Bulls uniform* is illogical for the reasons explained above. *See* MTD, 21. To recap, Panini has rights to the Bulls; Upper Deck has rights to Jordan's image. Combining the two does not magically grant Panini any rights to Jordan or extinguish Upper Deck's claim for relief.  Panini effectively claims a "buy one get one free" theory of defense, with the rights to the most famous athlete in the world thrown in without paying him anything.

### 2.     *Jordan Is Identifiable in the Pippen Card*

Panini's argument about consumers' inability to identify Jordan fails. MTD, 22. As an initial matter, it inserts its own facts for those alleged in the Complaint. *Cf*

---

[12] While not expressly placed at issue in Panini's MTD, the elements of the right of publicity causes of action are set forth in *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1273 n.4 (9th Cir. 2013).

MTD, 22 (Jordan's image is "very small, non-identifiable" and contains "no facial characteristics visible to the naked eye.") *with* Compl. ¶¶ 16, 21 (Jordan, especially in combination with him famous number is highly recognizable), ¶ 37 (Panini "cleverly and purposely features Jordan in the bottom right corner" of the Pippen card), ¶ 42 (media outlets and consumers quickly noticed Jordan's appearance in the cards). Under the facts alleged, those viewing "the photograph [of Jordan] with the naked eye [have] reasonably determine[d] that the person depicted in the photograph is [Jordan]." *See* Cal. Civ. Code § 3344(b)(1); and *see Newcombe v. Adolf Coors Co*., 157 F.3d 686, 692-93 (9th Cir. 1998) (finding a triable issue as to identifiability of a drawing of a lesser known baseball pitcher's stance with no facial visibility and a different jersey number).

Panini's use of an actual photo of Jordan including his face and recognizable jersey in the backdrop of the card can and has "consciously or subconsciously conjure[d] up images of [Jordan]" in consumers' minds. *Id.* at 693; *see* Compl. ¶ 42.[13] The fact that Panini chose to use Pippen and Rodman – Jordan's best known teammates – as the "featured" athletes on the card further adds to the conscious or subconscious recognizability of Jordan. *See e.g. The Last Dance*, Episode 2, Jason Hehir (Director), ESPN (2020) at minute 4 (Michael Jordan states: "Whenever they speak Michael Jordan, they should speak Scottie Pippen. When everybody says I won all these championships, but I didn't win without Scottie Pippen. And, you know, that's why I considered him my best teammate of all time.").

Panini's lone supporting authority is inapt. The photo features a non-famous male bending over, obscuring his face – which is further obscured by a hat and sunglasses. *Young v. Greystar Real Estate Partners, LLC*, No. 318-CV-02149-BEN-

---

[13] A secondary market search for the "[P]ippen optic retro" card reveals that consumers recognize Jordan in the card and find his appearance significant. *See* RNJ, Ex. 4 (available at https://www.ebay.com/sch/i.html?_from=R40&_nkw=pippen+optic+retro&_sacat=0&rt=nc&LH_Sold=1&LH_Complete=1) (making remarks such as "Jordan in Corner," "Pippen/Michael Jordan," "with Michael Jordan.").

MSB, 2019 WL 4169889, at *4 (S.D. Cal. Sept. 3, 2019); and *see id.* at ECF No. 16-4 (depicting image at issue).

### 3.      Panini's Use Is Not Incidental

Panini, once again, argues with the alleged facts in attempting to support a disingenuous incidental use defense that fails to comport with binding precedent.

"The rationale for the incidental use defense is that an incidental use has no commercial value." *Yeager,* 265 F.3d at 1177. Panini contends featuring Rodman and Pippen is the sole commercial purpose of its cards and that Jordan's "incidental" image is of no more value than unknown spectators looking on in the background. MTD, 23.[14] Not so. As outlined repeatedly in the Complaint, Panini intentionally manipulates images of Jordan into the background of its cards to trade on his enormous brand value and draw an association in consumers' minds between Jordan and Panini. Compl. ¶¶ 9-11. Featuring Jordan in trading card sets is highly valuable, drives product sales, stimulates interest in Panini's products, and bestows Panini with the goodwill associated with the most famous athlete on the planet. *Id.* at ¶¶ 22, 39, 41, 51, 52. The fact Jordan is in the background does not change this given the importance of background imagery to trading card value. *Id.* at ¶¶ 44-48. Recasting the Complaint and blaming others for picking up on the obvious association with Jordan that its cards aim to foster does not change this result. MTD, 24.

The Ninth Circuit rejects dubious arguments like Panini's. *See In re NCAA Student-Athlete Name & Likeness Licensing Litig*., 724 F.3d 1268, 1277 (9th Cir. 2013).[15] *In re NCAA* addressed a videogame manufacturers' attempt to avoid

---

[14] Panini also contends that, on the Pippen Card, Jordan is no bigger than Pippen's shoe. MTD, 23. This is true, but he is also the same size as the Bull's team logo which Panini pays to license and place on its cards.

[15] This case addressed the "transformative use" defense rather than the "incidental use" defense Panini raises here, but much like incidental use, transformative use asks whether "the marketability and **economic value** of the challenged work derive[s] primarily from the fame of the celebrity depicted." *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 407 (2001). *In re NCAA* explicitly addressed and rejected the argument that its formulation of the right of publicity extends to incidental use of celebrity likeness. 724 F.3d 1268 at fn. 10.

athletes' right of publicity claims by downplaying the importance of the athletes' likeness to its product. The court found "[i]f EA did not think there was value in having an avatar designed to mimic each individual player, it would not go to the lengths it does to achieve realism in this regard. Having chosen to use the players' likenesses, EA cannot now hide behind . . . the alleged unimportance of any one individual player." *Id.* and *see Perkins v. Linkedin Corp.*, 53 F. Supp. 3d 1222, 1255 (N.D. Cal. 2014) (rejecting motion to dismiss premised on incidental use of the plaintiff's photo by networking website on reminder emails to potential customers because plaintiff alleged that such emails "serve as personalized endorsements for LinkedIn's services."). Similarly here, Panini creatively selects and edits photos for its cards in a way that captures Jordan's image, but now avers the appearance of Jordan it strained to capture creates no value. MTD, 23-24. This is disingenuous.[16]

Tellingly, Panini's one cited authority addressing incidental use found that small, electronic replicas of a large group of athletes were *not* incidental. *See Davis v. Elec. Arts Inc.*, 775 F.3d 1172, 1181 (9th Cir. 2015). The same result should follow here.  Moreover, Panini fails to cite any controlling authority in which a court dismissed a claim at this stage based upon the incidental use defense.

### 4. Jordan Is Not Merely a Member of a Defineable Group

Panini's "definable group" defense is unavailing. MTD, 24-25. Like incidental use, this so-called "face in the crowd" defense hinges on the lack of value stemming from the depiction of the individual in the disputed work. *See e.g.* Pictures—Faces in the crowd, Rights of Publicity and Privacy § 4:65 (2d ed.) (*citing Johnson v. Harcourt, Brace, Jovanovich, Inc.*, 43 Cal. App. 3d 880, 894 (Cal. Ct. App. 1974)) (there is no cause of action for a mere face in the crowd because of "the picture of any one person in the group has no inherent commercial value in

---

[16] For example, on the secondary market, the Rodman Card featuring Jordan sells for hundreds of dollars while other Rodman cards not featuring Jordan fail to top even five dollars. RJN, Ex. 3 (eBay listings).  *See* Compl. ¶ 52. Likewise, listings for these cards consistently reference Jordan.

PLAINTIFF THE UPPER DECK COMPANY'S OPPOSITION TO DEFENDANT PANINI AMERICA, INC.'S MOTION TO DISMISS

promoting the sale of the product."). While there is scant authority on the issue, and Panini cites none, in a right of publicity case brought by members of the Mets baseball team, New York's high court rejected the notion that the image of the entire team created the exclusive value of the work as well as the argument that consumers could not identify each player. *Shamsky v. Garan, Inc.*, 167 Misc. 2d 149, 154-55 (N.Y. Sup. Ct. 1995). The court reasoned that, while not of high quality, the team photo was "identifiable to legions of baseball fans." *Id.* at 155. Still further, while the full-team element of the photo certainly created value, the players "have an independent existence" and separately identifiable value. *Id.* at 154. In the same way the New York's high court refused to dismiss individual athletes' importance to group photos, this Court should reject Panini's attempt to dismiss Jordan's value and evade paying for its use. This is especially true because of the limited number of athletes in  the photos at issue and Jordan's immense value.

### F.    UCL Claims Cannot Be Dismissed

Panini's final section (MTD, 25) argues derivative Unfair Competition Law claims fail because all other causes of action fail. This is not so for the reasons stated above. Independently, to the extent the Court dismisses any claims based on statutory standing, the claim should survive under the UCL. A UCL claim can be brought by any "person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. In turn, unfair competition is "anything that can properly be called a business practice and that at the same time is forbidden by law." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Thus, Upper Deck maintains UCL standing to pursue all illegal practices at issue in the other causes of action.

### IV.   CONCLUSION

The Court should reject Panini's multifaceted attempt to evade liability for trading on one of the worlds most iconic brands. To the extent the Court dismisses any cause of action, Upper Deck seeks leave to amend.

Respectfully submitted:

DATED:   May 1, 2020                    **NICHOLAS & TOMASEVIC, LLP**

                                 By:      */s/   Shaun Markley*
                                         Craig M. Nicholas (SBN 178444)
                                         Shaun Markley (SBN 291785)
                                         225 Broadway, Floor 19
                                         San Diego, California 92101
                                         Telephone: (619) 325-0492
                                         Facsimile: (619) 325-0496
                                         Email: cnicholas@nicholaslaw.org
                                         Email: smarkley@nicholaslaw.org

                                         Attorneys for Plaintiff

PLAINTIFF THE UPPER DECK COMPANY'S OPPOSITION TO DEFENDANT PANINI
AMERICA, INC.'S MOTION TO DISMISS