1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

THE UPPER DECK COMPANY, a
Nevada corporation,

Plaintiff,

v.

PANINI AMERICA, INC.,

Defendant.

Case No.:  20cv185-GPC(KSC)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S
MOTION TO DISMISS**

**[Dkt. No. 12.]**

Before the Court is Defendant's motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 12.)  Plaintiff filed an opposition and Defendant replied.  (Dkt. Nos. 16, 19.)  Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss.

**Background**

On January 29, 2020, Plaintiff Upper Deck Company ("Plaintiff" or "Upper Deck") filed a complaint against Defendant Panini America, Inc. ("Defendant" or "Panini") alleging eight claims under the Lanham Act and related state law causes of action.  (Dkt. No. 1, Compl.)  The eight causes of action are: 1) false endorsement and false advertising under the Lanham Act, 15 U.S.C. § 1125(a); 2) trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c); 3) trademark infringement under 15 U.S.C. §

1

1114; 4) intentional interference with prospective economic relationship; 5) intentional interference with contractual relationship; 6) commercial misappropriation; 7) right of publicity under California Civil Code section 3344 *et seq.*; and 8) unfair competition pursuant to California Business & Professions Codes Code sections 17200 *et seq.* ("UCL").  (*Id.*)

Upper Deck is a worldwide sports and entertainment company that produces sports memorabilia products, trading card products, as well as many other sports and entertainment products.  (*Id.* ¶ 2.)  For decades, Upper Deck has been and continues to have an exclusive license with Michael Jordan ("Jordan") to "use his image, name, likeness, marks, and other rights on and in connection with, among other products, trading cards."  (*Id.* ¶ 4.)  It has been the only trading card manufacturer to have a license agreement with Jordan.  (*Id.* ¶ 7.)  Jordan's name has been registered as a trademark with the U.S. Patent and Trademark Office since at least 1988.  (*Id.* ¶ 16.)  Jordan's jersey number 23 is also a federally registered trademark.  (*Id.* ¶ 17.)

Panini is one of Upper Deck's main competitors in the trading card market and also enters into exclusive license agreements for, among other licensed products, trading cards and since 2009 has had exclusive license agreements with current active players of the National Basketball Association ("NBA").  (*Id.* ¶¶ 6, 8.)  However, its license does not include the right to feature Jordan in any Panini's trading cards.  (*Id.* ¶¶ 8, 32.)

Jordan's name is distinctive, famous and easily recognized throughout the world.  (*Id.* ¶ 16.)   In 1984, the Chicago Bulls drafted Jordan third overall in the NBA draft after a stellar collegiate career.  (*Id.* ¶¶ 17, 18.)  While in the NBA, Jordan won six championships with the Chicago Bulls; as a result, his name and image along with the number 23 is and continues to be legendary and may be the most famous name and jersey number in the history of professional sports.  (*Id.* ¶ 20.)  Millions around the world easily recognize these marks.  (*Id.* ¶ 21.)  As a result, trading cards featuring Jordan's publicity rights are highly valuable and highly sought after in the marketplace in the primary and secondary markets.  (*Id.* ¶ 22.)  Further, a new trading card featuring Jordan in his 23

number jersey has not been released for at least 10 years which has left collectors with an insatiable appetite for any Jordan trading card.  (*Id.* ¶ 25.)

The market for sports trading cards is extremely lucrative; for example, a single rare trading card featuring Jordan sold on eBay for $350,100.  (*Id.* ¶ 26.)  Moreover, the background imagery of a trading card can have substantial bearing on the value of the card.  (*Id.* ¶ 44.)  Use of cameos featuring ancillary figures in the background of trading cards increases the value of those cards, and individuals in the background of an image on a trading card can dramatically increase the value of both the trading card and the trading card release. (*Id.* ¶¶ 44-45.)

In November 2017, Panini printed the 2017-2018 Donruss Basketball Retro Series card featuring Scottie Pippen which did not include any image of Jordan.  (*Id.* ¶¶ 35, 37 (photo).)  Four months later, in April 2018, Panini released its 2017-2018 Donruss Optic Retro trading card set which was its more expensive and higher end version of the Donruss Basketball Retro series released in November 2017.  (*Id.* ¶ 36.)  Within the set, Panini included the same exact image featuring Scottie Pippen ("Pippen Card") on the 2017-2018 Donruss Basketball Retro Series, but this card included a small image of Jordan in the bottom right corner of the card.  (*Id.* ¶ 37 (photo).)  Panini later released its 2018-19 Panini Contenders Basketball trading card set.  (*Id.* ¶ 38.)  Within this set, Panini included a card of Dennis Rodman ("Rodman Card"), the background of which prominently featured Jordan.  (*Id.*)

Upper Deck alleges that Panini deliberately altered and manipulated Jordan's image into the background of these two trading card releases to market and increase the sale of its products and brand equity, to use Jordan for commercial gain, to confuse the market, and to harm Upper Deck including Upper Deck's brands, goodwill, and exclusive contract.  (*Id.* ¶¶ 9-10.)  As part of the exclusive license, Jordan assigned Upper Deck the right to begin an action relating to a third party's infringing use of Jordan's rights.  (*Id.* ¶¶ 27, 50, 94, 99.)  Defendant moves to dismiss the complaint for failure to state a claim on all causes of action which is fully briefed.

1

**Discussion**

2

**A.    Legal Standard as to Federal Rule of Civil Procedure 12(b)(6)**

3         Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to

4   state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Dismissal

5   under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or

6   sufficient facts to support a cognizable legal theory.  *See Balistreri v. Pacifica Police*

7   *Dep't.*, 901 F.2d 696, 699 (9th Cir. 1990).  Under Federal Rule of Civil Procedure

8   8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim

9   showing that the pleader is entitled to relief," and "give the defendant fair notice of what

10  the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*,

11  550 U.S. 544, 555 (2007).

12        A complaint may survive a motion to dismiss only if, taking all well-pleaded

13  factual allegations as true, it contains enough facts to "state a claim to relief that is

14  plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,*

15  550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual

16  content that allows the court to draw the reasonable inference that the defendant is liable

17  for the misconduct alleged."  *Id.*  "Threadbare recitals of the elements of a cause of

18  action, supported by mere conclusory statements, do not suffice."  Id.  "In sum, for a

19  complaint to survive a motion to dismiss, the non-conclusory factual content, and

20  reasonable inferences from that content, must be plausibly suggestive of a claim entitling

21  the plaintiff to relief."  *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir. 2009)

22  (quotations omitted).  In reviewing a Rule 12(b)(6) motion, the Court accepts as true all

23  facts alleged in the complaint, and draws all reasonable inferences in favor of the

24  plaintiff.  *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009).

25        Where a motion to dismiss is granted, "leave to amend should be granted 'unless

26  the court determines that the allegation of other facts consistent with the challenged

27  pleading could not possibly cure the deficiency.'"  *DeSoto v. Yellow Freight Sys., Inc.,*

28  957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture*

4

*Co.,* 806 F.2d 1393, 1401 (9th Cir. 1986)).  In other words, where leave to amend would be futile, the Court may deny leave to amend.  *See DeSoto,* 957 F.2d at 658; *Schreiber,* 806 F.2d at 1401.

**B.     First Cause of Action - Unfair Competition, 15 U.S.C. § 1125(a)**

Defendant moves to dismiss the false endorsement claim[1] under 15 U.S.C. § 1125(a)(1)(A) and false advertising claim under 15 U.S.C. § 1125(a)(1)(B).

The Lanham Act was intended to make "actionable the deceptive and misleading use of marks," and "to protect persons engaged in . . . commerce against unfair competition."  15 U.S.C. § 1127.  Section 43(a) of the Lanham Act provides, in pertinent part:

> (1) Any person who, on or in connection with any goods or services… uses in commerce…[any] false or misleading representation of fact, which--
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  "Section 1125(a) creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."  *Lexmark Int'l, Inc.*

---

[1] Because the Complaint alleges "trademark infringement, false designation of origin, false or misleading representation, and false or misleading description" under 15 U.S.C. § 1125(a)(1)(A), (Dkt. No. 1, Compl. ¶ 62), Defendant moves to dismiss the claim as a false association claim.  However, Plaintiff, in its opposition, clarifies that it is bringing a false endorsement under § 1125(a)(1)(A).  In the event Plaintiff files an amended complaint, it shall amend the complaint to correctly name the cause of action.

*v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).  Under § 1125(a)(1)(A), the Ninth Circuit has held that the unauthorized use of a celebrity's persona, image or likeness, may be brought as a false endorsement claim.  *See Brown v. Elec. Arts, Inc*., 724 F.3d 1235, 1239 (9th Cir. 2013) (claims may be brought under "§ 43(a) relating to the use of a public figure's persona, likeness, or other uniquely distinguishing characteristic to cause such confusion."); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992) (*abrogated on other grounds by Lexmark Int'l, Inc*., 572 U.S. at 118) ("A false endorsement claim based on unauthorized use of a celebrity's identity is a type of false association claim . . .which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product."); *White v. Samsung Elecs. America, Inc*., 971 F.2d 1395, 1399-1400 (9th Cir. 1992) ("[i]n cases involving confusion over endorsement by a celebrity plaintiff, "mark" means the celebrity's persona.")  A celebrity's "persona is a uniquely distinguishing characteristic that calls to mind a specific person and his publicly known sports personality." *Lemon v. Harlem Globetrotters Int'l, Inc*., 437 F. Supp. 2d 1089, 1095 (D. Ariz. 2006).

## 1.      15 U.S.C. § 1125(a)(1)(A) – False Endorsement

Defendant moves to dismiss the claim under 15 U.S.C. § 1125(a)(1)(A) because Panini's use of Jordan's marks, to include his "world renowned image" and his famous jersey number 23,[2] are not likely to cause confusion as to origin, sponsorship or approval of Panini's trading cards.  (Dkt. No. 12 at 14-15.[3])  Plaintiff responds that Panini's intentional, unlicensed and repetitive use of Jordan's image and jersey number on its trading cards deceives consumers into believing Jordan endorses the products which generates consumer interest in them.  (Dkt. No. 16 at 11-12.)  In reply, Defendant argues that the false endorsement claim based on Jordan's "celebrity persona" on the two trading

---

[2] In an amended complaint, Plaintiff should clarify the marks it is alleging is infringed because the Complaint states that the marks infringed also include the Bulls team name and colors on a Bulls uniform which it admits it has no exclusive rights.  (Dkt. No. 1, Compl. ¶ 40.)

[3] Page numbers are based on the CM/ECF pagination.

cards where Scottie Pippen and Dennis Rodman are prominently showcased does not likely cause confusion that Jordan endorsed those cards.  (Dkt. No. 19 at 7.)

The Lanham Act "prohibits only false endorsement, not mere use of an image or name." *Cairns v. Franklin Mint Co*., 107 F. Supp. 2d 1212, 1214 (C.D. Cal. 2000) (citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 28:14 (4th ed. 1996)).  Therefore, not all uses of a celebrity's image are actionable under § 1125(a); only those that suggest sponsorship or approval are prohibited.  *Id.*  "Under the law of false endorsement, likelihood of customer confusion is the determinative issue." *Cairns v. Franklin Mint Co*., 292 F.3d 1139, 1449 (9th Cir. 2002) (citation omitted).  "The 'likelihood of confusion' inquiry generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused" as to the sponsorship or approval of the goods bearing the marks at issue in the case." *Rearden LLC v. Rearden Commerce, Inc*., 683 F.3d 1190, 1209 (9th Cir. 2012).

The Ninth Circuit applies an eight-factor test modeled after the *Sleekcraft*[4] factors to determine whether there has been a likelihood of consumer confusion in celebrity cases.  *See Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc*., 778 F.3d 1059, 1069 (9th Cir. 2015).  These factors include:

1. the level of recognition that the plaintiff has among the segment of the society for whom the defendant's product is intended;
2. the relatedness of the fame or success of the plaintiff to the defendant's product;
3. the similarity of the likeness used by the defendant to the actual plaintiff;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent on selecting the plaintiff; and
8. likelihood of expansion of the product lines.

---

[4]1. *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

*Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007-08 (9th Cir. 2001).  "Although these are all factors that are appropriate for consideration in determining the likelihood of confusion, they are not necessarily of equal importance, nor do they necessarily apply to every case." *Id.* at 1008.  The Ninth Circuit has also noted that the "Lanham Act's likelihood of confusion standard is predominantly factual in nature." *Wendt v. Host Int'l, Inc*. 125 F.3d 806, 812 (9th Cir. 1997); *see also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1031 (9th Cir. 2010) ("[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena.") (citation omitted).

On a motion to dismiss, the Court accepts as true all facts alleged in the complaint and draws all reasonable inferences in favor of the plaintiff and determines whether the complaint alleges facts to state a claim that is plausible on its face.  In its motion, Defendant does not address the *Downing* factors; instead, it argues the merits of whether there is a likelihood of consumer confusion and asks the Court to resolve that issue.  For example, Panini argues there is no likelihood of confusion as to whether Jordan endorses its cards because the cards do not bear Jordan's name and a tiny figure of a Chicago Bulls team player in the background of Pippen's card is unidentifiable.  (Dkt. No. 12 at 16.)  As to the Rodman Card, Panini asserts it is not plausible that a background image of Jordan in a partially obscured Bulls jersey would cause consumers to be confused as to the origin or sponsorship of the card.  (*Id.*)  Panini continues that even if one were to be able to identify Jordan in the background, it is implausible to suggest that Jordan endorsed Rodman's and Panini's card based on its mere appearance.  (Dkt. No. 19 at 8.)  Finally, because the Panini cards are sold in packs, consumers do not know what individual cards are in them until after the purchase.  (*Id.*)  These merits-based arguments are not appropriate on a motion to dismiss.  In response, Plaintiff argues it has alleged sufficient facts under the eight-factor test to survive dismissal.  The Court agrees.

The Complaint 1) describes Jordan's high level of recognition as a world famous and easily recognized basketball player amongst those who buy basketball trading cards.

(Dkt. No. 1, Compl. ¶¶ 16-22); 2) Jordan's fame as a basketball player relates to Panini's use of his image on its basketball trading cards, (*id.*); 3) the actual image of Jordan is used as well as his jersey number 23, (*id.* ¶¶ 9, 37, 40); 4) example of confusion when a prominent sports memorabilia publisher published an article commenting on Jordan's appearance on Panini's new product line and reported "on the rarity of Jordan's appearance in an NBA trading card release given his exclusive license with Upper Deck, and the enormous consumer appetite for all things Jordan in a Bulls uniform, especially a trading card" and confusion on the secondary market, such as eBay, where sellers market Panini's cards as "Jordan cards", (*id.* ¶ 42); 5) the marketing channels to sell both parties' trading cards overlap on the primary and secondary markets, (*id.* ¶¶ 22, 26); 6) there exists an "enormous consumer appetite" for Jordan trading cards, (*id.* ¶ 42); and 7) Panini's use of Jordan in the background is intentionally designed to capture Jordan's value, (*id.* ¶¶ 9-10; 34-43).[5]  Based on these allegations addressing the *Downing* factors, the Complaint sufficiently alleges the likelihood of consumer confusion as to whether Jordan endorses the two cards at issue.  Thus, the Court DENIES Defendant's motion to dismiss the claim of false endorsement under 15 U.S.C. § 1125(a)(1)(A) for failing to allege likelihood of consumer confusion.[6]

/ / /

/ / /

---

[5] There is no allegation on the eighth factor on the likelihood of expansion of the product line.

[6] Defendant also summarily argues in one sentence that nominative fair use warrants dismissal which Plaintiff does not address in opposition.  (Dkt. No. 12 at 18.)  Nominative fair use is an affirmative defense and may be considered on a motion to dismiss if "the 'allegations in the complaint suffice to establish' the defense." *See Sams v. Yahoo! Inc*., 713 F.3d 1175, 1179 (9th Cir. 2013) (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)).  The nominative fair use defense requires the defendant to demonstrate a three-part test.  *See New Kids on the Block v. News Am. Publ'g., Inc.,* 971 F.2d 302, 308 (9th Cir. 1992) (a defendant must show 1) "the product or service in question must be one not readily identifiable without use of the trademark;" 2) "only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and 3) "the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.")  Because Defendant fails to brief the issue, the Court declines to consider the nominative fair use argument.

**2.      15 U.S.C. § 1125(a)(1)(B) – False Advertising**

Under the Lanham Act, a false advertising claim, "requires a showing that (1) the defendant made a false statement either about the plaintiff's or its own product; (2) the statement was made in commercial advertisement or promotion; (3) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (4) the deception is material; (5) the defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product." *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008) (quoting *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002)).  Under 15 U.S.C. § 1125(a)(1)(B), the statement must concern a misrepresentation about the "nature, characteristics, qualities, or geographic origin" of Panini's or another's products.  Defendant challenges the first, third and fourth factors.

**i      Actionable False Statements**

Defendant contends that Plaintiff has not identified any statement, in the form of Jordan's image, that is either literally false or literally true but likely to mislead.  (Dkt. No. 12 at 19-21.)  Plaintiff argues that including an image of Jordan in Panini's cards is a false and misleading statement about Panini's products and commercial activities by misrepresenting that Jordan authorizes its products when he does not.  (Dkt. No. 16 at 19-20.)

"To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citation omitted).  "However, a false advertising cause of action under the Act is not limited to literal falsehoods; it extends to false representations made by implication or innuendo." *PhotoMedex, Inc. v. Irwin*, 919, 932 (9th Cir. 2010) (citing *Cook, Perkiss & Liehe, Inc. v.*

10

*N. Cal. Collection Serv., Inc*., 911 F.2d 242, 245 (9th Cir. 1990)).  For example, "[a] statement actionable under the Lanham Act may be an affirmatively misleading statement, a partially incorrect statement, or a statement which is untrue as a result of a failure to disclose a material fact." *Skil Corp. v. Rockwell Int'l* Corp., 375 F. Supp. 777, 783 n.11 (N.D. Ill. 1974).  On the other theory of falsehood, "[c]ourts have also recognized that a statement can be literally true, but nevertheless misleading in the way it is presented." *U–Haul Int'l, Inc. v. Jartran, Inc*., 522 F. Supp. 1238, 1247 (D.Ariz.1981), *aff'd,* 681 F.2d 1159 (9th Cir. 1982); *Southland Sod Farms*, 108 F.3d at 1139.

Contrary to Defendant's argument that Plaintiff fails to identify a qualifying verbal or written statement made by Panini, a false advertising claim is not limited to spoken or written words, but applies to any misrepresentative "word, term, name, symbol, or device." 15 U.S.C. § 1125(a)(1); *American Traffic Solutions, Inc. v. Redflex Traffic Sys., Inc.,* No. CV–08–2051–PHX–FJM, 2009 WL 2714017, at *2 (D. Az. Aug. 27, 2009) (denying dismissal of a false advertising claim based on photographs because whether they were actually misleading cannot be decided on the pleadings alone).  Therefore, use of Jordan's image may constitute a false statement.

Here, Plaintiff appears to suggest that the false statements are both literally false and literally true but likely to mislead.  (Dkt. No. 16 at 18-19.)  However, the image of Jordan in both cards are not alleged to be altered; therefore, they are the actual image of Jordan and are literally true.  *See Gibson v. BTS North, Inc*., Case No. 16-24548-Civ-COOKE/TORRES, 2018 WL 888872, at *4 (S.D. Fla. Feb. 14, 2018) ("Given that Plaintiffs have not shown that the images themselves were altered, it is clear that the images in the advertisements are actual images of Plaintiffs. They therefore are not literally false . . . .").  In *Gibson*, while the court concluded that the use of the photographs were not literally false, they could be misleading and therefore, the district court denied summary judgment on that issue.  *Id.*

In this case, the Complaint claims that Jordan's inclusion in Panini's cards is a false and misleading statement about Panini's products and commercial activities by

confusing consumers to think that "Jordan held a similar affinity and reverence for its products, without paying for or even asking for such right." (Dkt. No. 1, Compl. ¶¶ 12 42.) These cards also misrepresent the "nature, characteristics, qualities or origin of Panini's product, services, or commercial activities and/or Jordan's authorized products, services, or commercial activities." (*Id.* ¶ 62.) Plaintiff's allegations state an actionable false statement and the Court denies dismissal on this factor.

### ii.    Actual Deception or Tendency to Deceive a Substantial Segment of its Audience

As to the third factor for a false advertising claim, Defendant argues that Plaintiff has not alleged that Jordan's image has a tendency to deceive a substantial segment of its audience. (Dkt. No. 12 at 21.) Plaintiff responds that there is a presumption of deception to false advertising claims involving intent to deceive consumers. (Dkt. No. 16 at 21-22.)

Under the third factor, "where a statement is literally false or the defendant intentionally set out to deceive, . . . actual deception" is presumed. *AECOM Energy & Constr., Inc. v. Ripley*, 348 F. Supp. 3d 1038, 1056 (C.D. Cal. 2018); *see William H. Morris Co. Grp. W, Inc*., 66 F.3d 255, 258 (9th Cir. 1995) (failure to establish that a significant number of consumers were actually deceived is not necessarily fatal because if the plaintiff intentionally misled consumers, we would presume consumers were in fact deceived and the defendant would have the burden of demonstrating otherwise).

The Complaint alleges that Panini sought to confuse consumers into thinking Jordan had an affinity and reverence of its products and "intentionally and egregiously uses these elements to associate its company and products with Jordan." (Dkt. No. 1, Compl. ¶¶ 12, 41.) Because the Complaint alleges Defendant intentionally set out to deceive, there is a presumption of actual deception. Accordingly, the Court DENIES Defendants' motion to dismiss on this element.

### iii    Materiality of Deception

Panini asserts that the Complaint fails to allege that Jordan's image is material to any consumer's purchasing decision because the trading cards are part of a set or series

so they cannot influence a consumer's purchasing decision.  (Dkt. No. 12 at 22.)  Upper Deck counters that use of Jordan's image in the trading cards is likely to influence purchasing decisions and misrepresents an inherent quality of its goods.  Because these cards are in a set, Panini's repeat use of Jordan's image now instills in the consumers' minds that they might draw a Jordan card from the pack and creates "the chase" for those cards.  (Dkt. No. 16 at 22-23.)

A false advertisement's deception is "material" if "it is likely to influence the purchasing decision" of the advertisement's audience.  *Southland*, 108 F.3d at 1139 (citing *Cook, Perkiss, and Liehe, Inc*., 911 F.2d at 244).  In *Rice v. Fox Broadcasting Co*., 330 F.3d 1170, 1181 (9th Cir. 2003), *overruled on other grounds by Skidmore as Trustee for Randy Craig Wolfe Trust v. Zeppelin*, 952 F.3d 1051 (9th Cir. 2020), on summary judgment, the court concluded that since "there is no evidence that a potential consumer could view the offending videotape jacket prior to purchase, any deception relating to advertisement of the videos must be immaterial."  *Id.*  However, the Court, on a motion to dismiss, is not determining whether there are material factual issues in dispute but looks to the allegations in the Complaint to determine whether Plaintiff has alleged that including Jordan in Panini's trading cards has likely influenced consumers' purchasing decisions.  The Complaint has provided facts to support this element.  It alleges that Panini's use of Jordan in its trading cards will likely influence consumers' purchasing decision.  (Dkt. No. 1, Compl. ¶¶ 22; 39, 41, 42, 51.)  In fact, the media and consumers have noted Jordan's appearance on Panini's cards and now demand higher prices when reselling the Panini "Jordan cards.  (*Id.* ¶¶ 22, 42.)  Thus, the Court DENIES Defendant's motion to dismiss based on material deception.

## C.   Third Cause of Action - Trademark Infringement – 15 U.S.C. § 1114

Defendant argues that the trademark infringement claim must be dismissed for lack of standing because Upper Deck is not the "registrant" of the Jordan marks.  (Dkt. No. 12 at 23-24.)  Moreover, Upper Deck has failed to allege whether it has an exclusive license and property interest in the name Michael Jordan and the "23" marks for all goods and

services.  (Dkt. No. 12 at 24.)  In response, Plaintiff contends it has standing because it is an exclusive licensee and the license allows it to freely enforce the trademarks at issue. (Dkt. No. 16 at 24.)

15 U.S.C. § 1114 allows an action for trademark infringement to be brought by the "registrant" of the mark.  15 U.S.C. § 1114.  The term registrant includes the "legal representatives, predecessors, successors and assigns of such applicant or registrant."  15 U.S.C. § 1127.  The Ninth Circuit has not addressed whether an exclusive licensee has standing to sue for trademark infringement under § 1114; yet the prevailing approach by district courts in this Circuit has been to hold "that standing may exist where the licensing agreement both grants an exclusive license and grants to the exclusive licensee a property interest in the trademark, or rights that amount to those of an assignee."  *Halcyon Horizons, Inc. v. Delphi Behavioral Health Grp., LLC*, No. 17-cv-00756-JST, 2017 WL 1956997, at *3 (N.D. Cal. May 11, 2017) (*quoting Innovation Ventures, LLC v. Pittsburg Wholesale Grocers, Inc.,* No. C 12-05523 WHA, 2013 WL 1007666, at *3 (N.D. Cal. Mar. 13, 2013)); *Lasco Fittings, Inc. v. Lesso Am., Inc.*, No. EDCV 13-02015-VAP (DTBx), 2014 WL 12601016, at *4 (C.D. Cal. Feb. 21, 2014) (same); *see also Visa U.S.A., Inc. v. First Data Corp.*, No. C 02–01786 JSW, 2005 WL 6271242, at *4 (N.D. Cal. Aug. 16, 2005) (no standing for a non-exclusive licensee without significant property rights to the trademark).

"The determination of whether a licensee has standing to sue under § 1114 largely depends on the rights granted to the licensee in the licensing agreement."  *Ultrapure Sys., Inc. v. Ham-Let Grp*., 921 F. Supp. 659, 665 (N.D. Cal. 1996).  For example, no standing exists if the license is non-exclusive or where the licensing contract indicates that the licensor retains exclusive ownership of the mark.  *Id.*  In *Ultrapure*, the court denied dismissal of the trademark infringement claim because the contract gave exclusive use of the trademark in the United States and did not set forth any restrictions on the licensee's ability to enforce the trademarks.  *Id*. at 665-66.  The court concluded that the plaintiff, as

the exclusive licensee, had a property interest in the trademark and qualified as an assignee or successor of the registrant. *Id.*

Therefore, a complaint must allege that a licensing agreement gave the licensee the exclusive use of the trademark and a property interest in the trademark or rights that are akin to those of an assignee. *See id.*; *Nat'l Licensing Ass'n, LLC v. Inland Joseph Fruit Co.,* 361 F. Supp. 2d 1244, 1254 (E.D. Wash. 2004) ("Where a licensing agreement does not grant the licensee a property interest in the mark or otherwise assign to the licensee the registrant-licensor's ownership rights, the licensee, even if exclusive, cannot enforce the mark under [15 U.S.C. § 1114(1)]"); *Experian Mktg. Solutions, Inc. v. List Serv. Direct, Inc.,* Case No. SACV 09-01375-CJC(MLGx), 2010 WL 11595830, at *1-2 (C.D. Cal. Apr. 21, 2010) (the plaintiff had standing where complaint alleged the plaintiff had right as an exclusive licensee to use and enforce the violation of the federally registered, incontestable trademark including the right to initiate litigation against infringement."); *Hem & Thread, Inc. v. Wholesalefashionsquare.com, Inc*., Case No. 2:19-cv-283-CBM-AFMx, 2019 WL 6486039, at *1 (C.D. Cal. Aug. 23, 2019) (denying dismissal based on standing because the agreement "specifically provides that either Plaintiff. . . may prosecute any infringement or otherwise unauthorized use of the Trademark" and it has the exclusive right to use the trademark in connection with its products).

In this case, the Complaint alleges that Jordan has a federally registered trademark of his name with the U.S. Patent and Trademark Office since at least 1988. (Dkt. No. 1, Compl. ¶ 16.)  Jordan's number "23" also is a federally registered trademark.  (*Id.* ¶ 17.) The Complaint further claims that Upper Deck has an exclusive license with Michael Jordan to use his "image, name, likeness, marks, and other rights on and in connection with, among other products, trading cards."  (*Id.* ¶ 4; *see also id.* ¶ 23.)  "As part of the exclusive license, Jordan assigned Upper Deck the right to commence an action relating to a third party's infringing use of Jordan's rights granted under the agreement." (*Id.* ¶ 27, *see also id*. ¶¶ 50, 94, 99.)  Plaintiff has plead that the terms of the license gives it the exclusive right to use and to enforce the marks at issue granting it a property interest in

20cv185-GPC(KSC)

the marks.  *See Ultrapure Sys., Inc.,* 921 F. Supp. at 665-66.  Taking the allegations in the Complaint as true, the Court DENIES Defendant's motion to dismiss the third cause of action for trademark infringement under 15 U.S.C. § 1114 for lack of standing.

Defendant additionally argues that the counterfeiting allegation fails because Plaintiff does not allege that any registered mark owned by Jordan covers trading cards.  Plaintiff does not address this argument.  Accordingly, the Court GRANTS the counterfeiting allegation as unopposed.

Finally, referencing its prior argument on likelihood of consumer confusion, Defendant asserts that the trademark infringement claim should be dismissed because Jordan's *de minimus* appearance in the background is not likely to cause consumers to believe that Panini's cards original came from or were endorsed by Jordan or Upper Deck.  As discussed above, the Court concluded that Plaintiff has adequately alleged likelihood of consumer confusion.  The same analysis applies here and Defendant's argument fails.  *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288 n. 2 (9th Cir. 1992) ("the elements of infringement and unfair competition claims are essentially the same; the rulings stand or fall together.").

**D.     Second Cause of Action - Trademark Dilution, 15 U.S.C. § 1125(c)(1)**

Defendant argues Plaintiff lacks standing to pursue a claim for trademark dilution because it is not the owner of the asserted trademarks.  (Dkt. No 12 at 22-23.)  Plaintiff disagrees arguing that courts have held that exclusive licensees may have standing to assert a trademark dilution claim.[7]  (Dkt. No. 16 at 23-24.)

---

[7] In opposition, Plaintiff argue that a registrant and an owner are not distinct but have the same meaning. (Dkt. No. 16 at 23.)  The Court disagrees. Registration of a trademark does not confer ownership but is only prima facie evidence of ownership.  *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999) ("[Plaintiff's] registration of the mark on the Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and of [Plaintiff's] exclusive right to use the mark on the goods and services specified in the registration.").  15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register . . . shall be prima facie evidence . . . of the owner's ownership of the mark").  However, despite the distinction, for purposes of standing in this case, the analysis is similar.  *See Bliss Clearing Niagara, Inc. v. Midwest*

20cv185-GPC(KSC)

By its terms, § 1125(c)(1) limits standing to the "owner" of the mark.  *See* 15 U.S.C. § 1125(c).  There is limited caselaw in this circuit on whether an exclusive licensee may have standing under § 1125(c)(1); however, similar to the analysis of standing under § 1114, district courts have looked to the provisions of the licensing agreement to determine the rights granted to the licensee.

In *STX, Inc. v. Bauer USA, Inc.*, No. C 96-1140 FMS, 1997 WL 337578, at *4 (N.D. Cal. June 5, 1997), the court, *sua sponte*, addressed standing under § 1125(c) and held that because the plaintiff was the exclusive licensee and not the owner of the trademark, it lacked standing.  *Id.* at *4.  As part of its reasoning, the court noted that the licensing agreement stated that the licensor was the owner of all right, title, and interest in the registered trademark and only gave plaintiff the exclusive right, license, and authority to manufacture, sell, and sublicense the licensed products.  *Id.* at *3.  Moreover, the agreement only allowed the licensor to make the decision whether to seek action against infringement of the marks; the licensee's ability to enforce the trademarks was restricted by contract.  *Id.*  In *Williams v. SBE Entm't Grp.*, Case No. CV 07–7006 GAF (PJWx), 2008 WL 11339999, at *4 (C.D. Cal. Nov. 10, 2008), the court granted dismissal of the dilution claim for lack of standing because the plaintiff was the licensee of the trademark and the license agreement limited its rights to the trademark.  *Id.*  The license agreement did not affirmatively give the plaintiff any right to sue for third-party violations of his licenses, and provided that "[a]ll rights not specifically granted to [Plaintiff] herein are specifically excluded from the scope of the licenses . . . and are expressly retained by UMG."  *Id.*  Due to these restrictions, the court concluded the plaintiff was not an owner or assignee of the trademark and lacked standing to bring the dilution claim.  *Id.*  These cases demonstrate that a court must look at the terms of the licensing agreement to assess

---

*Nrake Bond Co.,* 339 F. Supp. 2d 944, 959 (W.D. Mich. 2004) ("The few courts that have considered the [standing] issue under [1114] have indicated that the same rule applies to dilution claims under § 1125(c).") (citing cases).

whether the licensor granted the licensee rights that are functionally equivalent to that of an owner or assignee.[8]

Here, it is not disputed that Jordan owns the trademark to his name as well as the number 23.  (Dkt. No. 1, Compl. ¶¶ 16, 17.)  Upper Deck has an exclusive license with Jordan "to use his image, name, likeness, marks, and other rights on and in connection with, among other products, trading cards."  (*Id.* ¶¶ 4, 23.)  "As part of the exclusive license, Jordan assigned Upper Deck the right to commence an action relating to a third party's infringing use of Jordan's rights granted under the agreement."  (*Id.* ¶ 27, *see also* ¶¶ 50, 94, 99.)

On a motion to dismiss, Plaintiff has sufficiently alleged that it has exclusive rights to the trademarks.  The Court DENIES Defendant's motion to dismiss the trademark dilution cause of action under 15 U.S.C. § 1125(c)(1) for lack of standing.

**E.    Fourth and Fifth Causes of Action - Intentional Interference with Prospective Economic Relationship and Intentional Interference with Contractual Relationship**

Intentional interference with prospective economic relationship and interference with contractual relationship largely require a plaintiff to prove similar elements.  *Pac. Gas & Elec. Co. v. Bear Stearns & Co*., 50 Cal. 3d 1118, 1126 (1990) (noting the chief practical difference between these theories is that a broader range of privilege to interfere is recognized when the relationship interfered with is only prospective); *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1442 n. 4 (9th Cir. 1990) ("[plaintiff] must establish the same five elements to sustain a claim of intentional interference with prospective economic relations, except that an economic or business relationship with 'the probability of economic benefit' must be established in lieu of a specific contract.").

---

[8] Defendant's citation to *Love v. The Mail on Sunday*, No. CV 05-7798-ABC, 2006 WL 4046180, at *14 (C.D. Cal. Aug. 15, 2006), is not supportive because the plaintiff did not oppose the argument that it lacked standing to pursue a § 1125(c) claim because he was only an exclusive licensee of the mark and not the owner.

Under California law, an intentional interference with prospective economic relationship claim requires a party to show "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *CRST Van Expedited, Inc. v. Werner Enters., Inc.* 479 F.3d 1099, 1108 (9th Cir. 2007) (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)).  A plaintiff alleging interference with a prospective relationship is also required "to allege an act that is wrongful independent of the interference itself." *Id.*

Under California law, an intentional interference with contractual relationship claim requires a party to show "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *CRST Van Expedited, Inc.*, 479 F.3d at 1105 (citing *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 55 (1998)).

Panini seeks dismissal of both claims based on the third, fourth, and fifth elements. (Dkt. No. 12 at 24–29.)

### a.   Intentional Act

Defendant argues that Upper Deck fails to allege facts that it specifically intended to disrupt the relationship and contract or that Panini's was substantially certain its actions would disrupt Upper Deck's business relations and contract with Jordan.  (Dkt. No. 12 at 28.)  Plaintiff responds that it alleges that Panini had knowledge that its action would disrupt Upper Deck's contract or relationship with Jordan.  (Dkt. No. 16 at 28.)

To satisfy the intent element for an interference claim, a plaintiff must allege either "that the defendant desired to interfere with the plaintiff's prospective economic advantage," or alternatively, that "the defendant knew that the interference was certain or

substantially certain to occur as a result of its action." *Korea Supply Co.*, 29 Cal. 4th at 1154.

Contrary to Defendant's argument that Upper Deck fails to allege specific intent, in *Korea Supply*, the California Supreme Court held that specific intent "is not a required element of the tort of interference with prospective economic advantage" relying on its prior ruling in *Quelimane Co.*, 19 Cal. 4th at 56 that intentional interference with contract does not require specific intent. *Korea Supply Co*., 29 Cal. 4th at 1154-55. Next, the Court disagrees with Defendant's argument that Upper Deck's failure to plead knowledge of the relationship or contract is dispositive of the requisite intent requirement. *See Trindade v. Reach Medica Grp., LLC*, No. 12cv4759-PSG, 2013 WL 3977034, at *15-16 (N.D. Cal. July 31, 2013) (because the plaintiff had no knowledge of the specific contract or relationship, the intent element necessarily failed). In its motion, Defendant did not challenge the second element concerning its knowledge of the economic relationship or contract with Jordan.

Here, Plaintiff alleges that Defendant knew its conduct diminished the value of Upper Deck's contract and interfered with its future relationship with Jordan, (Dkt. No. 1, Compl. ¶¶ 83, 89), that Panini carefully manipulated its trading card designs in order to highlight Jordan, (*id.* ¶ 89), and those in the industry recognize the impact of peripheral imagery on trading cards, (*id.* ¶¶ 44-52).[9]  Upper Deck has stated facts to support its allegation of Panini's intent to disrupt Upper Deck's relationship and contract with Jordan.

### b.    Actual Disruption and Economic Harm

Panini contends that Upper Deck's bare allegations are not sufficient to show actual disruption and actual harm to Upper Deck because the Complaint fails to allege

---

[9] In support of its argument Upper Deck refers to a prior complaint filed by Panini involving Kobe Bryant, (Dkt. No. 16 at 28); however, it is unclear how another complaint with different facts can support whether Upper Deck has properly stated the element of intended disruption as defined by caselaw.

how its contract or future relationship with Jordan was disrupted; in fact, Upper Deck continues to have an economic and contractual relationship with Jordan and has not sufficiently alleged that any obligations have been made more costly or burdensome. (Dkt. No. 12 at 25-26.)  Upper Deck objects that Panini's use of Jordan in its trading cards attempts to confuse consumers about Panini and Jordan's affiliation and harms its reputation as the exclusive licensee of Jordan products and the expected goodwill and brand value.  (Dkt. No. 16 at 25.)  By undermining the exclusivity of the agreement, it dilutes the value of the contract with Jordan and the consumer market for Jordan cards. (*Id.*)

Speculative allegations concerning actual disruption and economic harm are insufficient to state a claim.  *See Sybersound Records, Inc., v. UAV Corp.,* 517 F.3d 1137, 1151 (9th Cir. 2008) (affirming dismissal of intentional interference with economic relationship claim where plaintiff's alleged disruptions were conclusory claiming it "has been harmed because its ongoing business and economic relationships with Customers have been disrupted" and did not plead "for example, that it lost a contract nor that a negotiation with a [c]ustomer failed"); *Vascular Imaging Prof'ls, Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1014 (S.D. Cal. 2019) (holding that general conclusory allegations regarding lost sales, absent well-plead facts in support of these contentions, does not satisfy the pleading requirements for interreference with economic relations); *Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1312 (N.D. Cal. 1997) (holding that "reli[ance] on general allegations of 'loss of business opportunities' with unidentified 'existing and potential clients and customers' was insufficient because plaintiff did not allege specific facts in support, for example, that "sales of a[ny] particular software . . . decreased" as a result of defendant's actions).

Where interference makes enjoyment of a contract "more expensive or burdensome" there may be actionable disruption; an actual breach of a contract is not required.  *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1127.  Upper Deck cites to *Behr Process Corp. v. RPM Int'l Inc.*, Case No. SACV 14-156-JLS (DFMx), 2014 WL 12584385, at

*2–4 (C.D. Cal. May 20, 2014) as authority "recognizing 'harm to business reputation and goodwill' as colorable disruption." (Dkt. No. 16 at 26.) However, in *Behr*, the defendant claimed, not only that the plaintiff's alleged misrepresentation had damaged defendant's "business reputation and goodwill," but also that it "made [defendant]'s performance of the contract more expensive and/or difficult." Accordingly, the Court ruled that these factors "[*t*]*aken together* . . . [made] it plausible that the alleged misrepresentation made performance under the contract more costly or burdensome" in line with the California Supreme Court's holding in *Pac. Gas & Elec. Behr Process Corp.*, 2014 WL 12584385 at *2 (emphasis added). Unlike the defendant in *Behr*, Upper Deck does not allege that its contract with Jordan has been terminated, that its terms have changed, or that performance has become more costly or burdensome as a result of the Pippen and Rodman Cards. Similarly, Plaintiff's citation to *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-CV-3200-N-BT, 2020 WL 819392 (N.D. Tex. Feb. 19, 2020) does not support its position because, there, the district court found that on the claim for intentional interference with contractual relations, the counterclaimant sufficiently alleged that the counterdefendant's actions "harmed its contracts, reduced the contracts' value, and caused extra expense." *Id.* at 3. Further on the claim for intentional interference with prospective economic relations, the counterclaimant adequately alleged a "reduction in expected sales, a drop in its trading cards' value, and a diminution of goodwill." *Id.* Here, Upper Deck does not allege any additional costs or burdens concerning its economic relations or contract with Jordan or any reduction in sales.

Moreover, "[g]oodwill is the amount by which a business's overall value exceeds the value of its constituent assets, often due to a recognizable brand name, a sterling reputation, or an ideal location." *People v. Dry Canyon Enters., LLC*, 211 Cal. App. 4th 486, 493-94 (2012). In California, recognizing that there is "no single acceptable method of valuing goodwill . . . , the methodologies used to value goodwill are by and large based on a business's profitability." *Id.* at 493 ("Regardless of the cause, however, goodwill almost always translates into a business's profitability. Experts, in turn, look to

profitability as a gauge for valuing goodwill."); *see People ex rel. Dept. of Trans. v. Muller*, 36 Cal. 3d 263, 271 (1984) (finding that, "to characterize the profitability . . . lost as [loss of] goodwill is consistent with the definition of goodwill used in other contexts").

Upper Deck claims that Panini's conduct disrupts its exclusive license with Jordan by reducing its value and the goodwill associated with the contract.  (Dkt. No. 1, Compl. ¶¶ 10, 54, 85.)  By its conduct, Panini diluted the license relationship and harmed Upper Deck who paid and continues to pay large sums for the exclusive rights while not receiving the full advantage of exclusivity that it bargained for and "diminishes the value of Upper Deck's agreement by diverting to Panini the sales proceeds and the exclusivity for which Upper Deck pays Jordan."  (*Id.* ¶ 84.)  It also dilutes the market and "reduces the value of Upper Deck's cards by diminishing the goodwill and publicity value surrounding Jordan."  (*Id.* ¶ 85.)

Upper Deck's argument concerning economic harm of diverted sales and loss of goodwill and value both relate to lost sales or profitability on Jordan cards.  However, such allegations are conclusory and Upper Deck provides no facts in support of its contention that it lost potential customers or sales, thereby suffering economic harm.  For example, there is no allegation that sales of a particular Jordan trading card featuring Jordan by Upper Deck decreased after Panini's release of the Pippen and Rodman Cards.

Accordingly, Upper Deck fails to sufficiently plead the fourth and fifth elements of actual disruption and harm and the Court GRANTS Panini's motion to dismiss based on these two factors.

### c.    Independently Wrongful Act

Finally, Defendant summarily argue that Upper Deck fails to allege that its conduct was "wrongful by some legal measure other than the fact of interference itself" because it has failed to allege any claims.  Plaintiff argues that it has alleged the claims under the Lanham Act.

"[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal

20cv185-GPC(KSC)

standard." *Korea Supply*, 29 Cal. 4th at 1159.  Here, because the Lanham Act claims have survived, independent wrongful acts have been sufficiently alleged.

However, based on Upper Deck's failure to sufficiently plead the fourth and fifth elements of actual disruption and harm, the Court GRANTS Panini's motion to dismiss Upper Deck's fourth cause of action of intentional interference with prospective economic relations and fifth cause of action for intentional interference with contractual relations.

**F.     Sixth Cause of Action - Commercial Misappropriation and Seventh Cause of Action – Right of Publicity**

The elements of a right-of-publicity claim under California common law are: "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 679 (2010).  A statutory claim for right to publicity under California Civil Code section 3344 requires a plaintiff to prove "all the elements of the common law cause of action" plus "a knowing use by the defendant as well as a direct connection between the alleged use and the commercial purpose." *Id.*  California's statutory right of publicity "complement[s]" the common law right of publicity but "neither replaces nor codifies the common law cause of action." *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691-92 (9th Cir. 1998).

The right to publicity and section 3344 claims are assignable under California law. *Timed Out, LLC v. Youabian, Inc*., 229 Cal. App. 4th 1001, 1008 (2014); *Del Amo v. Baccash*, No. CV 07-663 PSG (JWJx), 2008 WL 2780978, at *9 (C.D. Cal. July 15, 2008) (citing *KNB Enters. v. Matthews*, 78 Cal. App. 4th 362, 365 n. 2 (2000) (holding that "the right of publicity is assignable for purposes of a [§] 3344 claim.")).

**1**.     **Standing**

Panini claims that the Complaint has not alleged facts to support standing on these causes of action as an exclusive licensee of images of Jordan in a Bulls jersey; it only alleges an exclusive license as to Jordan's image, name, likeness, marks and other rights.

(Dkt. No. 12 at 30-31.)  Plaintiff argues that Panini's argument is without merit and is attempting to immunize its infringing conduct by arguing that because the cards feature Jordan in a Bulls uniform, Plaintiff does not have right to enforce the Jordan marks because he is in a Bulls uniform and Panini has those rights.  (Dkt. No. 16 at 29.)

Similar to the analysis standing for trademark infringement under § 1114 and dilution under § 1125(c), a determination of standing as to a right to publicity claim under California law depends on the rights granted to the licensee in the license agreement.  *See Fighters Inc., LLC v. Elec. Arts Inc.,* No. CV 09-06389 SJO(VBKx), 2009 WL 10699504, at *5-6 (C.D. Cal. Oct. 30, 2009) (examining rights contained in the licensing agreement); *Upper Deck Authenticated, Ltd. v. CPG Direct*, 971 F. Supp. 1337, 1349 (S.D. Cal. 1997) (it is unlikely that a non-exclusive licensee could assert a claim for right of publicity) (citing *Bi–Rite Enters., Inc. v. Button Master*, 555 F. Supp. 1188, 1200 (S.D.N.Y. 1983) ("A nonexclusive licensee acquires no proprietary interest in the publicity rights of the licensor and accordingly has no standing to sue for violation of those rights." (citing 3 M. Nimmer, Nimmer on Copyright ¶¶ 10.02, 12.02 (1982)).

The Complaint alleges that Upper Deck has an exclusive license to Jordan's marks and Jordan has assigned the right to the publicity and commercial misappropriation claims to Upper Deck.  (Dkt. No. 1, Compl. ¶¶ 27, 50, 94, 99.)  The Complaint alleges that the image of Jordan is in both trading cards without the consent of Upper Deck or Jordan.  (*Id.* ¶¶ 95, 100.)  Therefore, on a motion to dismiss, the Court concludes that the Complaint sufficiently alleges standing on the right-of-publicity claims.

### 2,      Readily Identifiable as to Pippen Card

Panini contends that Jordan is not readily identifiable on the Pippen Card when viewed with the "naked eye" because the card features a "very small, non-identifiable image of Jordan in the bottom-right corner."  (Dkt. No. 12 at 32.)  Acknowledging that a viewer might be able to determine that the person is wearing a Bulls jersey, the number is not discernable and the person could be any of the Bulls players that year.  (*Id.*)  In opposition, Upper Deck argues it has alleged that Jordan and his famous number 23 in

combination is distinct and highly recognizable and has "consciously or subconsciously conjure[d] up images of [Jordan]" in consumers' minds.  (Dkt. No. 16 at 30.)

Under section 3344, a "person shall be deemed to be readily identifiable from a photograph when one who views the photograph with the naked eye can reasonably determine that the person depicted in the photograph is the same person who is complaining of its unauthorized use."  Cal. Civ. Code § 3344(b)(1).  The statute expressly provides that liability based on a photograph requires that the plaintiff be "readily identifiable." Cal. Civ. Code § 3344(a). The Ninth Circuit has held that the same "readily identifiable" standard applies to claims based on alleged misappropriation of "likeness." *Newcombe*, 157 F.3d at 692.

In *Young*, the court concluded that the complaint failed to allege a plausible claim that the plaintiff was readily identifiable in a photograph that the defendant reposted on an apartment complex's Facebook and Instagram webpages without his consent.  *Young v. Greystar Real Estate Partners, LLC*, Case No.: 3:18-cv-02149-BEN-MSB, 2019 WL 4169889, at *4 (S.D. Cal. Sept. 3, 2019).  The photograph depicted an unidentified male wearing a hat and sunglasses, bending over and scratching a dog's belly at the beach together with the caption "Welcome to doggy heaven [emoji] Your pup will love nearby Ocean Beach Dog Beach, a leash-free haven for pets, people and sandy belly rubs. . . ." *Id.*  The court rejected the plaintiff's argument that he was readily identifiable because his whole frame was visible but the court stated that the only visible facial characteristic was "a small, shadowy sliver of the individual's chin" and the "remainder of the face and all the individual's hair is not discernable" and "the remaining viewable aspects of the depicted individual's frame (back, the backside of his arms and frontside of his legs and feet) are common, plain, and non-identifying."  *Id.*  The court also noted that the complaint revealed that the defendant was unaware of the plaintiff's identity.  *Id.*

In *Newcombe*, the challenged image was a drawing that was based on, and virtually identical to, an actual photo of the plaintiff, a former major league baseball all-star, that had appeared in a newspaper.  *Newcombe,* 157 F.3d at 690. The court observed it was "as

though the black and white newspaper photo had been traced and colored in." *Id.*  As such, the drawing undoubtedly was a "likeness" of the plaintiff; the only question was whether it was "readily identifiable," given that the facial features were not entirely visible.  *Id.* at 693.  The court noted that the pitcher's stance was unique to the plaintiff and not generic.  *Id.* at 692.  The court reviewed various aspects of the visual representation itself and concluded there was at least a triable issue of fact as to whether the image was readily identifiable as plaintiff.  *Id*. at 693.

Here, the Complaint alleges that Jordan's image, along with his number 23 is distinctive and highly recognizable, (Dkt. No. 1, Compl. ¶¶ 1, 21), and the Pippen Card "cleverly and purposely features Jordan in the bottom right corner", (i*d. ¶* 36). Moreover, it complains that background imagery is an important factor in the trading card market and can increase the value of the cards.  (*Id.* ¶¶ 44, 45.)  The Pippen Card features Scottie Pippen in the forefront and on the bottom right-hand corner is a picture of a teammate in a shadowy background no larger than Pippen's sneakers where the name and number on the jersey are not identifiable.  However, a basketball fan, through context, may immediately identify Jordan, by his build, skin color, or by being a fellow teammate of Pippen, as the player in the background.  Moreover, Defendant is aware the image is of Jordan, a highly recognized basketball player.  Accordingly, Plaintiff has plausibly alleged that Jordan is readily identifiable in the Pippen Card and DENIES dismissal on this basis.

### 3.    Incidental Use

Defendant argues that the use Jordan's image in both cards is incidental; therefore, both right-of-publicity claims fail.  (Dkt. 12 at 33.)  Upper Deck disagrees and alleges Panini has used Jordan's image to trade on Jordan's enormous brand value. (Dkt. No. 16 at 31.)

Incidental use is a defense for right of publicity and commercial misappropriation claims.  *Davis v. Elec. Arts Inc*., 775 F.3d 1172, 1180 n.5 (9th Cir. 2015) ("Although California courts have not yet held that the incidental use defense applies to right-of-

publicity claims, the defense is widely recognized.").  Incidental use of a plaintiff's name or likeness does not give rise to liability under a common law claim of commercial misappropriation or a claim under section 3344.  *Aligo v. Time–Life Books, Inc.*, No. C 94–20707 JW, 1994 WL 715605, at \*2 (N.D. Cal. Dec. 19, 1994).  "The rationale underlying this doctrine is that an incidental use has no commercial value, and allowing recovery to anyone briefly depicted or referred to would unduly burden expressive activity."  *Pooley v. Nat. Hole–In–One Ass'n*, 89 F. Supp. 2d 1108, 1112 (D. Ariz. 2000); *see also Yeager v. Cingular Wireless, LLC*, 673 F. Supp. 2d 1089, 1100 (E.D. Cal. 2009).  Court have considered factors of "(1) whether the use has a unique quality or value that would result in commercial profit to the defendant, (2) whether the use contributes something of significance, (3) the relationship between the reference to the plaintiff and the purpose and subject of the work, and (4) the duration, prominence or repetition of the likeness relative to the rest of the publication."  *Davis,* 775 F.3d at 1180 (citing *Aligo,* 1994 WL 715605, at \*3 (internal citations omitted)).  Moreover, it is "highly unusual for a court to dismiss a complaint on the basis that a defendant has proven an affirmative defense."  *Designer Skin, LLC v. S & L Vitamins, Inc.*, CV 05–3699, 2007 WL 841471, at \*2 (D. Ariz. March 19, 2007).  "However, where the court can discern from the face of the pleadings that an affirmative defense applies as a matter of law, dismissal pursuant to Rule 12(b)(6) may be appropriate."  *Yeager,* 673 F. Supp. 2d at 1177 (citing *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 783 n. 1 (9th Cir. 1997).

Plaintiff has alleged that Panini intentionally included images of Jordan into the background of its cards to take advantage of Jordan's enormous brand value and as a result, the cards drives product sales, stimulates interest in Panini's products and bestows on Panini with the goodwill associated with the most famous athlete on the planet.  (Dkt. No. 1, Compl. ¶¶ 9-11 22, 39, 41, 51, 52).  The Complaint alleges that the use of Jordan's name was not incidental; therefore, the Court cannot determine as a matter of law that Defendant's inclusion of Jordan's image in its trading cards was merely incidental.  The Court DENIES Defendant's motion to dismiss based on incidental use

### 4.      Member of Definable Group

Defendant summarily contends, without legal authority, that the seventh cause of action of right to publicity fails because Jordan is only identified as a member of an NBA basketball team, and not as an individual.  (Dkt. No. 12 at 34.)  In response, Plaintiff argues that the defense hinges on the lack of value stemming from the image of the individual; here, Jordan is not merely a member of a definable group.  (Dkt. No. 16 at 32-33.)

California's right of publicity statute excludes certain photographs of "definable groups" from its scope.  Cal. Civ. Code § 3344(b)(2).

Sections 3344(b)(2)-(3) provides

(2) If the photograph includes more than one person so identifiable, then the person or persons complaining of the use shall be represented as individuals rather than solely as members of a definable group represented in the photograph. A definable group includes, but is not limited to, the following examples: a crowd at any sporting event, a crowd in any street or public building, the audience at any theatrical or stage production, a glee club, or a baseball team.
(3) A person or persons shall be considered to be represented as members of a definable group if they are represented in the photograph solely as a result of being present at the time the photograph was taken and have not been singled out as individuals in any manner.

Cal. Civ. Code §§ 3344(b)(2)-(3).  Caselaw is scant on this provision.  However, by its definition, definable group includes a "crowd", "audience", "club", or "team", which suggests a group photo involving many people.  Here, the Pippen Card shows Pippen in the forefront and Jordan in the background and the Rodman Card features Rodman in the forefront and Jordan and another unidentified player in the background.  It does not appear that these cards feature a definable group.  Accordingly, the Court DENIES Defendant's motion to dismiss on this ground.

/ / /

/ / /

## G. Unfair Competition

Defendant summarily moves to dismiss the unlawful prong of the UCL claim arguing Plaintiff has failed to sufficiently allege any other claims in the Complaint. Plaintiff disagrees but also contends that even if the Court dismisses any claims based on statutory standing, the UCL claims survives because it can be brought by any "person who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted).

The Complaint alleges unlawful business practices under California Business & Professions Code sections 17200 *et seq*.[10] (Dkt. No. 1, Compl. ¶¶ 104-06.) Because the Court GRANTS dismissal of the claims for intentional interference with prospective economic relations and intentional interference with contractual relations, the Court GRANTS dismissal of the UCL claim based on these two claims. The Court DENIES the UCL claims as to the remaining claims.

## H. Leave to Amend

Where a motion to dismiss is granted, leave to amend should be granted "unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *DeSoto*, 957 F.2d 658 (quoting *Schreiber Distrib. Co.,* 806 F.2d at 1401). In other words, where leave to amend would be futile, the Court may deny leave to amend. *See Desoto,* 957 F.2d at 658*; Schreiber,* 806 F.2d at 1401. Here, Plaintiff seeks leave to amend on any claims that the Court dismisses. Because Plaintiff can cure the deficiencies in the Complaint, the Court

---

[10] The Complaint does not assert it seeks claims under the unfair or fraudulent prongs of the UCL. (*See* Dkt. No. 1, Compl. ¶¶ 104-05.)

GRANTS Plaintiff leave to file a First Amended Complaint. *See De Soto*, 957 F.2d at 658.

## I.      Request for Judicial Notice

Plaintiff filed a request for judicial notice of a complaint and memorandum filed in support of Panini's ex parte motion for temporary restraining ordered in a case filed by Panini in the Central District of California and two e-Bay search results. (Dkt. No. 16-1.) Defendant filed an opposition. (Dkt. No. 20.) While the Court questions the relevance of a complaint and brief in an entirely different case where no ruling has issued, because the Court did not consider these documents in its order, the Court DENIES Plaintiff's request for judicial notice as moot.

Conclusion

Based on the above, the Court GRANTS in part and DENIES in part Defendant's motion to dismiss with leave to amend. Plaintiff may file an amended complaint within 20 days of the Court's order.

IT IS SO ORDERED.

Dated:  June 29, 2020

Hon. Gonzalo P. Curiel
United States District Judge