1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UPPER DECK COMPANY, a Nevada corporation,<br><br>                                    Plaintiff,<br><br>v.<br><br>PANINI AMERICA, INC.,<br><br>                                    Defendant. | Case No.: 20cv185-GPC(KSC)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>**[REDACTED - ORIGINAL FILED UNDER SEAL]**<br><br>**[Dkt. No. 42.]** |

Before the Court is Defendant's motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (Dkt. No. 42.) Plaintiff filed an opposition and Defendant replied. (Dkt. Nos. 47, 51.) Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendant's motion for judgment on the pleadings.

## Background

On August 24, 2020, Plaintiff Upper Deck Company ("Plaintiff" or "Upper Deck") filed the operative second amended complaint ("SAC") against Defendant Panini America, Inc. ("Defendant" or "Panini") alleging six causes of action for 1) false affiliation/false endorsement, false advertising, and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); 2) trademark dilution under the Lanham Act, 15 U.S.C. §

1

1125(c); 3) trademark infringement under 15 U.S.C. § 1114; 4) commercial misappropriation; 5) right of publicity under California Civil Code section 3344 *et seq.*; and 6) unfair competition pursuant to California Business & Professions Code sections 17200 *et seq.* ("UCL").  (Dkt. No. 28, SAC.)

Upper Deck is a worldwide sports and entertainment company that produces sports memorabilia products, trading card products, as well as many other sports and entertainment products.  (*Id.* ¶ 2.)  For decades, Upper Deck has been and continues to have an exclusive license with Michael Jordan ("Jordan") to "use his image, name, likeness, marks, and other rights on and in connection with, among other products, trading cards."  (*Id.* ¶ 4.)  It has been the only trading card manufacturer to have a license agreement for trading cards with Jordan.  (*Id.* ¶ 7.)  Jordan's name has been registered as a trademark with the U.S. Patent and Trademark Office since at least 1988.  (*Id.* ¶ 16.)  Jordan's jersey number 23 is also a federally registered trademark (collectively "Jordan Marks").  (*Id.* ¶ 17.)

Panini is one of Upper Deck's main competitors in the trading card market and also enters into exclusive license agreements for, among other licensed products, trading cards and since 2009 has had exclusive license agreements with current active players of the National Basketball Association ("NBA").  (*Id.* ¶¶ 6, 8.)  However, its license does not include the right to feature Jordan in any of Panini's trading cards.  (*Id.* ¶¶ 8, 32.)

Jordan's name is distinctive, famous and easily recognized throughout the world. (*Id.* ¶ 16.)   In 1984, the Chicago Bulls drafted Jordan third overall in the NBA draft after a stellar collegiate career.  (*Id.* ¶ 18.)  While in the NBA, Jordan won six championships with the Chicago Bulls; as a result, his name and image along with the number 23 is and continues to be legendary and may be the most famous name and jersey number in the history of professional sports.  (*Id.* ¶ 19-20.)  Millions around the world easily recognize these marks.  (*Id.* ¶ 21.)  As a result, trading cards featuring Jordan's publicity rights are highly valuable and highly sought after in the marketplace in the primary and secondary markets.  (*Id.* ¶ 22.)  Further, a new trading card featuring Jordan in his 23 number jersey

has not been released for at least 10 years which has left collectors with an insatiable appetite for any Jordan trading card.  (*Id.* ¶ 25.)

The market for sports trading cards is extremely lucrative; for example, a single rare trading card featuring Jordan sold on eBay for $350,100.  (*Id.* ¶ 26.)  Moreover, the background imagery of a trading card can have substantial bearing on the value of the card.  (*Id.* ¶ 44.)  Use of cameos featuring ancillary figures in the background of trading cards increases the value of those cards, and individuals in the background of an image on a trading card can dramatically increase the value of both the trading card and the trading card release. (*Id.* ¶¶ 44-45.)

In November 2017, Panini printed the 2017-2018 "Donruss Basketball Retro Series" card featuring Scottie Pippen which did not include any image of Jordan.  (*Id.* ¶¶ 35, 37 (photo).)  Four months later, in April 2018, Panini released its 2017-2018 Donruss Optic Retro trading card set which was its more expensive and higher end version of the Donruss Basketball Retro Series released in November 2017.  (*Id.* ¶ 36.)  Within the set, Panini included the same exact image featuring Scottie Pippen ("Pippen Card") on the 2017-2018 Donruss Basketball Retro Series, but this card included a small image of Jordan in the bottom right corner of the card.  (*Id.* ¶ 37 (photo).)  Panini later released its 2018-19 Panini Contenders Basketball trading card set.  (*Id.* ¶ 38.)  Within this set, Panini included a card of Dennis Rodman ("Rodman Card"), the background of which prominently featured Jordan.  (*Id.*)

Upper Deck alleges that Panini deliberately altered and manipulated Jordan's image into the background of these two trading card releases to market and increase the sale of its products and brand equity, to use Jordan for commercial gain, to confuse the market, and to harm Upper Deck including Upper Deck's brands, goodwill, and exclusive contract.  (*Id.* ¶¶ 9-10, 39.)  As part of the exclusive license, Jordan assigned Upper Deck the right to begin an action relating to a third party's infringing use of Jordan's rights. (*Id.* ¶¶ 27, 50.)

1    During discovery, Plaintiff produced the license agreement entitled ████████

2  ████████████████ Agreement ("Agreement") between Upper Deck ████████

3  ██.[1]  (Dkt. No. 54, Agreement, (UNDER SEAL).)  In its motion, Defendant moves for

4  judgment on the pleadings on a part of the first and sixth causes of action and on the

5  second, third, fourth and fifth causes of action for lack of standing.  Plaintiff opposes

6  arguing it has standing to bring these causes of action.

**Discussion**

**A.    Legal Standard as to Federal Rule of Civil Procedure 12(c)**

Federal Rule of Civil Procedure ("Rule") 12(c) allows parties to move for

judgment on the pleadings after the pleadings have been closed but prior to trial, and

"within such time as not to delay the trial."  Fed. R. Civ. P. 12(c).  The standard for

determining a Rule 12(c) motion for judgment on the pleadings is the same as the

standard for a Rule 12(b)(6) motion to dismiss.  *Cafasso, U.S. ex rel. v. Gen. Dynamics*

*C4 Sys., Inc*., 637 F.3d 1047, 1053 & n.4 (9th Cir. 2011) (the same standard of review

applies to motions brought under Rule 12(c) as motions brought under Rule 12(b)(6)).

On a Rule 12(c) motion, "the allegations of the non-moving party must be accepted as

true, while the allegations of the moving party which have been denied are assumed to be

false."  *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc*., 896 F.2d 1542, 1550

(9th Cir. 1989).  "Judgment on the pleadings is proper when the moving party clearly

establishes on the face of the pleadings that no material issue of fact remains to be

resolved and that it is entitled to judgment as a matter of law."  *Id.*  A court must not

consider matters beyond the pleadings as such a proceeding must be treated as a motion

for summary judgment.  *Id.*

---

[1] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████ (Dkt. No. 54, Agreement ¶ 15 (UNDER SEAL).)

Under the incorporation by reference doctrine, the Court may consider in a motion to dismiss any documents referenced in the complaint or on which the complaint necessarily relies.  *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1159-60 (9th Cir. 2012); *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 999–1002 (9th Cir. 2018) ("A plaintiff incorporates a document by reference where the complaint "refers extensively to the document or the document forms the basis of the plaintiff's claim.").  "Specifically, courts may take into account 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'"  *Davis*, 691 F.3d at 1160 (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)).

The parties do not dispute that the Agreement, though not attached to the SAC, may be incorporated by reference on the motion for judgment on the pleadings.  (Dkt. No. 42 at 9; Dkt. No. 47 at 13.)  Because the Agreement is referred to repeatedly in the SAC, forms the basis for Plaintiff's claims and the parties do not dispute the authenticity of the document, the Court will consider the Agreement as incorporated by reference in the SAC without converting the motion into one for summary judgment.  *See Davis*, 691 F.3d at 1160.

**B.     Standing on First, Second and Third Causes of Action**

First of all, Defendant moves to dismiss part of the SAC's first claim[2], as well as the second and third claims for lack of standing because Plaintiff has not explicitly been granted a license to use the Jordan Marks given that the Agreement does not specifically convey a license in any trademark and only references right to use "Jordan's name and likeness."  (Dkt. No. 42 at 11.)  Upper Deck responds that the Agreement provides for an express license to use the Jordan Marks as it encompasses "Michael's Jordan's name and

---

[2] Defendant moves to dismiss paragraph 58 of the first cause of action alleging that Upper Deck has exclusive rights to use certain of Jordan's marks including Michael Jordan and "23."  (Dkt. No. 28, SAC ¶ 58.)

likeness" which are registered trademarks. (Dkt. No. 47 at 17-18.) It claims that Jordan's "likeness" reasonably extends to his jersey number "23". (*Id.* at 18.) Moreover, Panini argues, at most, Upper Deck's argument demonstrates the Agreement is ambiguous and warrants an examination of extrinsic evidence to determine the parties' intent. (*Id.* at 19.)

While there is no explicit reference allowing Upper Deck to use the Jordan Marks, the Agreement ███████████████████████████████████████████████████ ██████████████████████████." (Dkt. No. 54, Agreement ¶ 2(A) (UNDER SEAL).) ████████████████████████████████ (*Id.* ¶ 1(A) (UNDER SEAL).) ████████████████████████████████ (*Id.* ¶ 2(A) (UNDER SEAL).) The SAC alleges and Defendant does not challenge that "Michael Jordan" and his jersey number "23" are federally registered trademarks. (Dkt. No. 28, SAC ¶¶ 16, 17.) The Court questions Plaintiff's position that a license to Jordan's "likeness" extends to Jordan's jersey number "23" and whether a license to Jordan's "name" equates to a license to his trademark. However, on a motion for judgment on the pleading, the Court concludes the SAC has plausibly alleged that the Agreement includes use of the Jordan Marks and the Court cannot conclude that it is clearly established that no material issue of fact remains to be resolved. Moreover, because the Agreement is reasonably susceptible to Upper Deck's interpretation, to the extent that these terms are ambiguous, extrinsic evidence should be considered, and such an analysis is also not proper on a motion for judgment on the pleadings. Accordingly, the Court DENIES Defendant's motion for judgment on the pleading on this issue.

**C.     Standing on Second and Third Causes of Action**

Next, Defendant argues the second cause of action for trademark dilution, under 15 U.S.C. § 1125(c), and third cause of action for trademark infringement, under 15 U.S.C. § 1114, must be dismissed for lack of standing because Upper Deck is not an exclusive licensee of the Jordan Marks and it has no property interest in the name Michael Jordan and the "23" marks for all goods and services. (Dkt. No. 42 at 12-13; 17-18.) Plaintiff

contends that it has a sole, exclusive, worldwide license to use Jordan's name and likeness worldwide for 10 years in trading cards.  (Dkt. No. 47 at 22.)  Further, Plaintiff asserts that the property rights argument raised by Defendant is without merit.  (*Id.* at 25-26.)

15 U.S.C. § 1114 allows an action for trademark infringement to be brought by the "registrant" of the mark.  15 U.S.C. § 1114.  The term registrant includes the "legal representatives, predecessors, successors and assigns of such applicant or registrant."  15 U.S.C. § 1127.  "To establish standing to sue for trademark infringement under the Lanham Act, a plaintiff must show that he or she is either (1) the owner of a federal mark registration, (2) the owner of an unregistered mark, or (3) a nonowner with a cognizable interest in the allegedly infringed trademark."  *Halicki Films, LLC v. Sanderson Sales and Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008).  In this case, the issue is whether Plaintiff is a "nonowner with a cognizable interest in the allegedly infringed trademark."  *See id.*  In addition, a claim for trademark dilution limits standing to the "owner" of the mark.  *See* 15 U.S.C. § 1125(c).

As the Court noted in its prior order, the Ninth Circuit has not addressed whether an exclusive licensee has standing to sue for trademark infringement under § 1114 or standing to sue for trademark dilution under § 1125(c)(1).  *Upper Deck Co. v. Panini America, Inc.*, 469 F. Supp. 3d 963, 977, 979 (S.D. Cal. 2020).  For standing under § 1114, the prevailing approach by district courts in this circuit has been to hold "that standing may exist where the licensing agreement both [1] grants an exclusive license and [2] grants to the exclusive licensee a property interest in the trademark, or rights that amount to those of an assignee."  *Halcyon Horizons, Inc. v. Delphi Behavioral Health Grp., LLC*, No. 17-cv-00756-JST, 2017 WL 1956997, at *3 (N.D. Cal. May 11, 2017) (*quoting Innovation Ventures, LLC v. Pittsburg Wholesale Grocers, Inc.,* No. C 12-05523 WHA, 2013 WL 1007666, at *3 (N.D. Cal. Mar. 13, 2013)); *Lasco Fittings, Inc. v. Lesso Am., Inc.*, No. EDCV 13-02015-VAP (DTBx), 2014 WL 12601016, at *4 (C.D. Cal. Feb. 21, 2014) (same); *see also Visa U.S.A., Inc. v. First Data Corp.*, No. C 02–01786 JSW,

2005 WL 6271242, at *4 (N.D. Cal. Aug. 16, 2005) (no standing for a non-exclusive licensee without significant property rights to the trademark); *Nat'l Licensing Ass'n, LLC v. Inland Joseph Fruit Co.,* 361 F. Supp. 2d 1244, 1254 (E.D. Wash. 2004) ("Where a licensing agreement does not grant the licensee a property interest in the mark or otherwise assign to the licensee the registrant-licensor's ownership rights, the licensee, even if exclusive, cannot enforce the mark under [15 U.S.C. § 1114(1)]"); *see also DEP Corp. v. Interstate Cigar Co.,* 622 F.2d 621, 623 (2nd Cir. 1980) (licensee lacks standing when provisions in the contract indicate the licensor retains exclusive ownership of the mark).

"The determination of whether a licensee has standing to sue under § 1114 largely depends on the rights granted to the licensee in the licensing agreement." *Ultrapure Sys., Inc. v. Ham-Let Grp*., 921 F. Supp. 659, 665 (N.D. Cal. 1996).  For example, no standing exists if the license is non-exclusive or where the licensing contract indicates that the licensor retains exclusive ownership of the mark.  *Id.*  In *Ultrapure*, the court denied dismissal of the trademark infringement claim because the contract gave exclusive use of the trademark in the United States and did not set forth any restrictions on the licensee's ability to enforce the trademarks.  *Id*. at 665-66.  The court concluded that the plaintiff, as the exclusive licensee, had a property interest in the trademark and qualified as an assignee or successor of the registrant.  *Id.*

In its prior order, the Court also noted that district courts have applied a similar § 1114 analysis to establish standing under § 1125(c)(1) by looking at the terms of the licensing agreement and what rights were granted to the licensee.  *Upper Deck Co.,* 469 F. Supp. 3d at 979 (citing *STX, Inc. v. Bauer USA, Inc*., No. C 96-1140 FMS, 1997 WL 337578, at *4 (N.D. Cal. June 5, 1997); *Williams v. SBE Entm't Grp*., Case No. CV 07–7006 GAF (PJWx), 2008 WL 11339999, at *4 (C.D. Cal. Nov. 10, 2008)).

The primary case cited by Plaintiff, *Innovation Ventures*, involved an assignment and a reciprocal license back agreement commonly recognized in trademark law.  *Innovation Ventures* 2013 WL 1007666, at *2.  The court noted that the rights conveyed

by the licensor to the exclusive licensee appeared to be substantial and included (1) the right to use all intellectual property including the "exclusive right to use, make, have made, import, offer to sell, and sell any product or process including the right to sublicense in the United States and throughout the world"; and (2) the right to sue for infringement and to compel the licensor to join the lawsuit. *Id.* at *5. The court noted that the licensor "lost its ability to use the trademarks in any way" and the "rights retained [by the licensor] were few." *Id.* Because some rights were retained by the licensor, such as whether the rights retained by the licensor included the title and ownership of the mark, some control over litigation related to the mark, and the right to inspect the licensee's use of the marks to ensure the quality of the products", the court stated it was a "close call" whether "all" significant rights to the trademarks-in-suit were granted and declined to rule on it on a motion to dismiss. *Id.* at 6.

Alternatively, in *Lasco Fittings*, the court distinguished the licensing agreement before it from the one granted in *Innovation Ventures*, and on a motion to dismiss, found the plaintiff lacked standing to bring suit. 2014 WL 12601016, at *4. The *Lasco* court relied on four distinctions in finding the license agreement was limited in scope; (1) the "[l]icense is only for certain types of products and not for the trademark in its entirety," (2) "the license contains clauses explicitly stating that the licensor retains title and ownership of the mark and all rights not expressly granted in this exclusive license," (3) "the licensor retains control over the nature and quality of the products sold by LASCO using the mark, a requirement that is not consistent with an assignment," and (4) "although the [l]icense gives LASCO the right to sue to enforce the mark for certain products covered under the license, LASCO must notify the licensor and may not enforce the trademark in relation to other products." *Id.* Finally, the court concluded the "structure of the [l]icense agreement d[id] not suggest the parties intended the exclusive [l]icense to be equivalent to an assignment." *Id.*

To establish standing, the Agreement must grant to the exclusive licensee "a property interest in the trademark, or rights that amount to those of an assignee." *See*

*Halcyon Horizons, Inc*., 2017 WL 1956997, at *3.  In distinguishing between an assignment and a license, one district court explained that "[a] assignment passes legal and equitable title to the property while a license is mere permission to use.  Assignment is the transfer of the whole of the interest in the right while in a license the owner retains the legal ownership of the property."  *Innovation Ventures, LLC*, 2013 WL 1007666, at *3 (quoting *Presley's Estate v. Russen*, 513 F. Supp. 1339, 1350 (D.N.J. 1981)).  Therefore, a property right that amounts to those of an assignee requires an assignment of the entirety of the trademark for all goods and not limited to certain types of products and the licensor retains significant title and ownership of the mark.  *See Lasco Fittings*, 2014 WL 12601016, at *4 (no standing because, *inter alia,* "[l]icense is only for certain types of products and not for the trademark in its entirety,"); *Nova Wines, Inc. v. Adler Fels Winery LLC*, 467 F. Supp. 2d 965, 974 (N.D. Cal. 2006) (licensee did not have standing where exclusive license was only for certain types of wine and a clause reserved to the licensor all rights not explicitly granted; therefore, the license was non-exclusive and did not convey a property interest).

In this case, the parties do not dispute that the analysis for standing under § 1114 and § 1125 are similar and agree that standing will depend on the terms of the Agreement nor do they appear to dispute the material rights granted or not granted to Upper Deck in the Agreement.  (*See* Dkt. No. 42; Dkt. No. 47.)  They disagree on the legal standard to support standing.  Defendant argues that an exclusive licensee has standing to pursue trademark infringement and trademark dilution claims only if the licensee has rights that amount to an assignment of the trademark which means the right to use the Jordan Marks in all products.  On the other hand, Plaintiff argues that it has standing to sue because it has an exclusive worldwide license to use Jordan Marks in a specific product, that is, trading cards.  The Court concludes that Defendant's argument is in line with caselaw.

1       Here, the Agreement █████████████████████████████████ ████

2   ██████████████████████████████████████████████, (Dkt. No. 54,

3   Agreement ¶¶ 2(A); 10[4] (UNDER SEAL)); it does not grant an exclusive license to use

4   the Jordan Marks in all products.  Moreover, the Agreement unambiguously states ████

5   ████████████████████████████████████████████████████

6   █████████████ (Dkt. No. 54, Agreement ¶ 3[5] (UNDER SEAL).)  Because the

7   Agreement grants Plaintiff exclusive rights to ████████████████ and not exclusive rights

8   to the trademarks, Plaintiff does not have a property right to the trademarks akin to an

9   assignment.  *See Nova Wines, Inc.,* 467 F. Supp. 2d at 974 (licensee did not have standing

10  where exclusive license was only for certain types of wine and a clause reserved to the

11  licensor all rights not explicitly granted).

12      Upper Deck responds that it has standing as an exclusive licensee of trading cards

13  because the Agreement grants it the ability to pursue litigation against third party

14  infringers and because it has exclusive rights to make a designated product bearing the

15  marks at issue citing *Hem & Thread, Inc. v. Wholesalefashionsquare.com, Inc*., Case No.

16  2:19-cv-283-CBM-AFMx, 2019 WL 6486039, at *1 (C.D. Cal. Aug. 23, 2019).  In *Hem*

17  *& Thread*, in a summary analysis and also without the benefit of the written license

18  agreement, the court denied dismissal based on standing because the complaint alleged

19  that the agreement "specifically provides that either Plaintiff. . . may prosecute any

20  infringement or otherwise unauthorized use of the Trademark" and it had the exclusive

21  ─────────────────

22  [3] The Court must take as true the allegation in the SAC on a Rule 12(c) motion.  Here, the SAC alleges

23  that the Agreement covers Jordan's name and jersey number "23" trademarks.

24  [4] The Agreement states that Upper Deck owns, ██████████████████████████████████

25  ████████████████████ (Dkt. No. 54, Agreement ¶ 10 (UNDER SEAL).) This provision
    limits Upper Deck rights and ownership solely to certain types of products and not for the trademark in

26  its entirety.

    [5] The licensor ██████████████████████████ and the licensor will not █████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████" (Dkt. No. 54, Agreement ¶ 3 (UNDER SEAL).)

1   right to use the trademark in connection with its products.  *Id.* (citing *Lasco Fittings*,

2   2014 WL 12601016, at \*4).  However, the district court's reliance on *Lasco Fittings* does

3   not support its conclusion.  In *Lasco Fittings*, the court granted dismissal of the trademark

4   infringement claim because the exclusive license of the trademark was limited to certain

5   products and does not support Plaintiff's argument.  *See Lasco Fittings*, 2014 WL

6   12601016, at \*4.  Upper Deck also cites to *Novartis Animal Health US, Inc. v. LM*

7   *Connelly & Sons, Pty Ltd*., No. 04 Civ. 10213(BSJ), 2005 WL 1902085, at \*3 (S.D.N.Y.

8   June 14, 2005); however, in that case Novartis Animal Health US, Inc. had standing to

9   sue for trademark infringement because while it had an exclusive license of certain

10  trademarks used in connection with pet medicine it was also an "indirect subsidiary" of

11  the trademark owner, Novartis USA.  *Id.*  In this case, there is no corporate relationship

12  between Upper Deck ▮▮▮▮▮▮▮ and *Novartis Animal Health US* is not supportive of

13  Plaintiff's argument.

14       Further, "the structure of the [l]icense agreement does not suggest the parties

15  intended the exclusive [l]icense to be equivalent to an assignment."  *See Lasco Fittings*,

16  2014 WL 12601016, at \*4.  Throughout the Agreement are provisions requiring Upper

17  Deck to obtain the ▮▮▮▮▮▮▮▮▮▮▮ of the licensor.  The licensor's extended

18  retention of control illustrate that the Agreement does not transfer all substantive rights in

19  the Jordan Marks to Plaintiff, as the licensor retained the rights to (1) ▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮▮, (Dkt. No. 54, Agreement ¶ 4 (UNDER SEAL)), (2) ▮

21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*id.* ¶ 25(A), (3) ▮▮▮▮

22  ▮▮▮▮▮▮▮▮ (*id.* ¶ 23 (UNDER SEAL)), (4) a ▮▮▮▮▮▮▮▮▮

23  ▮▮▮▮▮▮, (*id.* ¶ 12 (UNDER SEAL)), and (5) ▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮, (*id.* ¶ 8(B) (UNDER SEAL)).

25       The Agreement does not grant Upper Deck a property interest in the trademark, or

26  rights that amount to those of an assignee.  *See Innovation Ventures*, 2013 WL 1007666,

27  at \*3.  Accordingly, Plaintiff lacks standing to bring the second and third cause of action

28

and the Court GRANTS Defendant's motion to dismiss the second and third causes of action.[6]

## 1.    Extrinsic Evidence

Plaintiff additionally argues that the Court should decline to address standing based solely on the Agreement because it should consider additional integral extrinsic evidence. (Dkt. No. 47 at 12-15.)  Defendant replies the Agreement is clear and unambiguous.  (Dkt No. 51 at 8-9.)

In California, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  Cal. Civ. Code § 1636; *Bank of the West v. Superior Ct.*, 2 Cal. 4th 1254, 1264 (1992).  "If contractual language is clear and explicit, it governs." *Bank of the West*, 2 Cal. 4th at 1264.

Under California contract law, "[w]here parties dispute the meaning of contractual language, 'the first question to be decided is whether the disputed language is 'reasonably susceptible' to the interpretation urged by the party.  If it is not, the case is over." *Halicki*, 547 F.3d at 1223.  The Court must provisionally receive extrinsic evidence to determine whether the contract at issue is "reasonably susceptible" to the interpretation urged by a party, even if the court concludes "'that the language of the contract appears to be clear and unambiguous on its face.'"  *Id.*  While extrinsic evidence may not "vary, alter or add to" the terms of a contract, it may be examined "'to prove a meaning to which the language of the instrument is reasonably susceptible'"; if the evidence supports the interpretation urged, then it is "'admitted to aid in . . . interpreting the contract.'"  *Id.*;

---

[6] Because the Court concludes that Plaintiff was not granted a property interest in the Jordan Marks that is akin to an assignment, which is dispositive of the standing issue, the Court need not address Defendant's additional argument that the Agreement did not grant an exclusive license, (Dkt. No. 42 at 13-17).  *See Halcyon Horizons, Inc.*, 2017 WL 1956997, at *3 (to establish standing the exclusive license must "[1] grant[] an exclusive license and [2] grant[] to the exclusive licensee a property interest in the trademark, or rights that amount to those of an assignee.").

*see also Spin Master, Ltd. v. Zobmondo Entm't*, LLC, Nos. CV 06–3459 ABC (PLAx), CV 07–0571 ABC (PLAx), 2011 WL 3714772, at *7 (C.D. Cal. Aug 22, 2011).

The Court concludes that the Agreement is unambiguous and not susceptible to different interpretations on the rights granted to Upper Deck in the Agreement to support standing on the second and third causes of action. Moreover, consideration of extrinsic evidence is not proper on a motion for judgment on the pleadings. However, even if the Court were to consider the extrinsic evidence, they do not offer an interpretation that differ from the explicit terms of the Agreement and are merely cumulative. Here, the extrinsic evidence offered by Plaintiff includes declarations by (1) Estee R. Portnoy, a personal representative of Michael Jordan, the licensor, (Dkt. No. 47-12, Portnoy Decl.); and (2) Jason Masherah, President of Upper Deck, (Dkt. No. 47-8. Masherah Decl.). First, they state that the licensor is fully aware of and support Plaintiff's legal action in this case, (Dkt. No. 47-12, Portnoy Decl. ¶ 7; Dkt. No. 47-8, Masherah Decl. ¶ 12.) However, ███████████████████████████████████, these declarations do not add any alternative interpretations. (*See* Dkt. No. 54, Agreement, ¶ 25(A) (UNDER SEAL) ████████████████████████ ████████████████████████

Second, the declarations provide that "Jordan will not grant any rights of any kind to any competitor of Upper Deck (e.g. other trading card manufacturers)." (Dkt. No. 47-12, Portnoy Decl. ¶ 4; *see also* Dkt. No. 47-9 Masherah Decl. ¶ 5.) Because Nike is not a trading card manufacturer the Agreement should not be construed to limit Jordan's ability to license his rights for non-trading card products to Nike and its subsidiaries. (Dkt. No. 47-12, Portnoy Decl. ¶ 4; *see also* Dkt. No. 47-9 Masherah Decl. ¶ 5.) No other entity can make trading cards featuring Jordan's name or likeness during the term of the Agreement. (Dkt. No. 47-12, Portnoy Decl. ¶ 5; *see also* Dkt. No. 47-9, Masherah Decl. ¶ 7.)

Again, the declarations do not provide any alternative interpretation of the contract. (*See* Dkt. No. 54, Agreement ¶ 8(A) (UNDER SEAL) ("████████████████████

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████████████████████████

3 ████████████████████████████).”); *id.* ¶ 11 (UNDER SEAL))████████████

4 █████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████

8 ███████████████████   These declarations do not provide an interpretation of the contract that

9 differ from the contract language.

Thus, in summary, the Court GRANTS Defendant's motion to dismiss the second cause of action for trademark dilution and third cause of action for trademark infringement.

**D.      Fourth Cause of Action – Common Law Commercial Misappropriation and Fifth Cause of action – Right of Publicity**

Defendant argues that Plaintiff lacks standing to pursue the fourth claim for common law commercial misappropriation and fifth claim for right of publicity because it is not the exclusive licensee of Jordan's publicity rights.  (Dkt. No. 42 at 18.)  Plaintiff responds that it has the right to sue as an assignee and as an exclusive licensee. (Dkt. No. 47 at 26.)

In California, "the right of publicity is both a statutory and a common law right." *Timed Out, LLC v. Youabian, Inc*., 229 Cal. App. 4th 1001, 1005 (2014) (quoting *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 391 (2001)).  Civil Code section 3344 "complements the common law tort of misappropriation of likeness."  *Id.* at 1006.  Both protect the "economic value of one's name, voice, signature, photograph, or likeness" and holder of the right of publicity possesses "a right to prevent others from misappropriating the economic value generated . . . through the merchandising of the 'name, voice, signature, photograph, or likeness' of the [holder]."  *Id.* (quoting *Comedy III*, 25 Cal. 4th at 403).

The right to publicity and section 3344 claims are assignable under California law. *Timed Out, LLC v. Youabian, Inc*., 229 Cal. App. 4th 1001, 1008 (2014); *Del Amo v. Baccash*, No. CV 07-663 PSG (JWJx), 2008 WL 2780978, at *9 (C.D. Cal. July 15, 2008) (citing *KNB Enters. v. Matthews*, 78 Cal. App. 4th 362, 365 n. 2 (2000) (holding that "the right of publicity is assignable for purposes of a [§] 3344 claim.")).

In *Timed Out*, the plaintiff was a company that "specialize[d] in the protection of personal image rights." *Timed Out, LLC*, 229 Cal. App. 4th at 1004. Professional models who earned a living modeling and selling their images to companies for advertising products and services learned that the defendants had been using their images on their website without the models' consent. *Id.* After this was discovered, the models "assigned their rights to bring suit for misappropriation of their images" to the plaintiff. *Id.* Plaintiff sued the defendants for common law and statutory misappropriation of likeness based on the defendants' alleged unauthorized display of the models' images in connection with advertising the defendants' cosmetic medical services. *Id.* On the issue of standing, the court of appeal held that the pecuniary interest in the right of publicity and misappropriations claims are assignable. *Id.* at 1010. Moreover, the court of appeal rejected the defendant's argument that "even if a misappropriation of likeness claim can be assigned, an 'exclusive license' is required to assert the claim" because the right to sue necessarily suggests Plaintiff obtained an exclusive right even though it was a limited one. *Id.* at 1011. The court explained that the assignment does not have to transfer the entire right of publicity to be enforced. *Id.*

Here, the Agreement grants Upper Deck ███████████████████████████ ████, (Dkt. No. 54, Agreement ¶ 25[7] (UNDER SEAL)), which the court of appeal in *Timed Out* held was sufficient to establish standing. Defendant's reliance on *Upper Deck*

---

[7] Paragraph 25 provides, in part, that ████████████████████████████████████ ██████████████████████████████████████████████████████████████████ █████████████████████" (Dkt. No. 54, Agreement ¶ 25 (UNDER SEAL).)

*Authenticated Ltd. v. CPG Direct*, 971 F. Supp. 1337 (S.D. Cal. 1997) to support its position is not persuasive as the court of appeal in *Timed Out* criticized the standing analysis of Upper Deck as not based in California law.  *Timed Out, LLC*, 229 Cal. App. 4th at 1008 n. 6.  The Court declines to rely on the ruling in U*pper Deck Authenticated Ltd.* and instead relies on the reasoning in *Timed Out.*  Accordingly, the Court DENIES Defendant's motion for judgment on the pleadings on the fourth and fifth causes of action.

**E.   Unfair Competition**

Finally, Defendant moves for judgment on the pleading for part of the sixth claim under the unlawful prong of the UCL claim based on violations of part of the first claim and fourth and fifth claims for common law and statutory rights of publicity.  (Dkt. No. 42 at 19.)  Plaintiff opposes.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  "Each of these three adjectives captures a separate and distinct theory of liability."  *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted).  A UCL claim based on the unlawful prong rises or falls with the underlying claim.  *See Aleksick v. 7-Eleven, Inc*., 205 Cal. App. 4th 1176, 1185 (2012) (a UCL cause of action under the "unlawful" prong fails if a statutory predicate is not stated); *Wolski v. Fremont Inv. & Loan*, 127 Cal. App. 4th 347, 357 (2005) (holding that a UCL claim rises or falls with the underlying claim on which it is predicated). Accordingly, because the Court DENIES dismissal of the claims on the first, fourth and fifth claims, the Court DENIES dismissal of the UCL claim based on these claims.

**F.   Leave to Amend**

Plaintiff seeks leave to amend if the Court grants dismissal of any of its claims. (Dkt. No. 47 at 29-30.)  However, the Court concludes that it would be futile to grant leave to amend the second and third causes of action.  Accordingly, the Court DENIES Plaintiff's request seeking leave to amend.

/ / /

**Conclusion**

Based on the above, the Courts GRANTS Defendant's motion for judgment on the pleadings on the second and third causes of action and DENIES on the first, fourth, fifth and sixth causes of action.

The hearing set on April 16, 2021 shall be **vacated.**

IT IS SO ORDERED.

Dated:  April 13, 2021

Hon. Gonzalo P. Curiel
United States District Judge

18